THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLARENCE WEALER, Defendant-Appellant.

Second District    No. 2—93—0034

Opinion filed June 29, 1994.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Clarence Wealer, entered a negotiated plea of guilty to the charge of aggravated criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, par. 12—16(c)(1)(i) (now 720 ILCS 5/12—16(c)(1)(i) (West 1992))) in the circuit court of Lake County and was sentenced to 8¹/₂ years' imprisonment. Following sentencing, the State moved for an order to obtain blood and saliva samples from defendant pursuant to section 5—4—3(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3 (now codified, as amended, at 730 ILCS 5/5—4—3 (West 1992))). Defendant objected, contending that section 5—4—3 mandated the taking of blood and saliva samples in contravention of his right to be free from unreasonable searches and seizures under the fourth amendment to the United States Constitution and article I, section 6, of the 1970 Illinois Constitution. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6.) The trial court granted the State's motion, denied defendant's motion to reconsider, and granted defendant a temporary stay of enforcement pending his application to this court for a stay pending appeal. Defendant filed a timely notice of appeal, and this court granted defendant's motion to stay the order for blood and saliva samples pending the outcome of his appeal.

In this case of first impression, we are asked to consider whether section 5—4—3 of the Unified Code of Corrections, which requires persons convicted of certain enumerated sex offenses to submit blood and saliva specimens to the Illinois Department of State Police for analysis and categorization into genetic marker groupings (commonly known as DNA testing), mandates State conduct violative of defendant's Federal and State constitutional rights to be free from unreasonable searches and seizures.

■ With recent advances in biotechnology, public officials have recognized with increasing frequency the value and potential of DNA testing in the context of criminal law enforcement. As a result, the Illinois legislature in 1989 amended the Uniform Code of Corrections to mandate that persons convicted of certain sex offenses submit

blood and saliva specimens to the Illinois Department of State Police for analysis and categorization into genetic marker groupings. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3 (now codified, as amended, at 730 ILCS 5/5—4—3 (West 1992)).) Section 5—4—3 provides, in relevant part:

"§ 5—4—3. (a) Any person convicted of, or who received a disposition of court supervision for, a sexual offense or attempt of a sexual offense *** shall, regardless of the sentence imposed, be required to submit specimens of blood and saliva to the Illinois Department of State Police ***.

* * *

(d) The *** State Police shall provide all equipment and instructions necessary for the collection of blood and saliva samples. *** The samples shall *** be forwarded to the *** Division of Forensic Services and Identification[ ] for analysis and categorizing into genetic marker groupings.

* * *

(g) *** '[S]exual offense' means any violation of Sections 11—11, 12—13, 12—14, 12—15 or 12—16 of the Criminal Code of 1961 ***." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3 (now 730 ILCS 5/5—4—3 (West 1992)).)

The sexual offenses enumerated in section 5—4—3 are sexual relations within families (section 11—11); criminal sexual assault (section 12—13); aggravated criminal sexual assault (section 12—14); criminal sexual abuse (section 12—15); and aggravated criminal sexual abuse (section 12—16).

The statute provides further that blood samples may be taken only by a physician authorized to practice medicine, a registered nurse, or other person qualified by the Department of Public Health. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3(d) (now 730 ILCS 5/5—4—3(d) (West 1992)).) Additionally, the genetic marker grouping analysis information is strictly confidential and generally can be released only to law enforcement and prosecutorial agencies. Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3(f) (now 730 ILCS 5/5—4—3(f) (West 1992)).

We note that several other States have enacted similar statutes. (See Ariz. Rev. Stat. Ann. § 13—4438 (1993); Cal. Penal Code § 290.2 (West 1993); Colo. Rev. Stat. Ann. § 17—2—201 (West 1993); Ga. Code Ann. § 24—4—60 (1994); Mo. Ann. Stat. § 650.055 (Vernon 1992); Nev. Rev. Stat. § 176.111 (1993); N.C. Gen. Stat. § 15A—266.4 (Supp. 1993); Okla. Stat. Ann. tit. 57, § 584 (West Supp. 1993); S.D. Codified Laws Ann. § 23—5—14 (1994); Va. Code Ann. § 19.2—310.2 (Michie 1990); Wash. Rev. Code Ann. § 43.43.754 (West 1994).) As discussed

below, two of those statutes have been unsuccessfully challenged on grounds similar to those urged before this court. See *Jones v. Murray* (4th Cir. 1992), 962 F.2d 302 (Virginia); *State v. Olivas* (1993), 122 Wash. 2d 73, 856 P.2d 1076.

■ Defendant contends that section 5—4—3 violates the fourth amendment to the United States Constitution because the blood and saliva sampling it mandates involves an unreasonable search and seizure. Relying primarily on *Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (warrantless nonconsensual extraction of blood supported by probable cause that individual was intoxicated held to be lawful search incident to arrest), defendant maintains that section 5—4—3 allows the State to conduct a search and seizure on the "mere chance" that he might commit a crime in the future and that the stored data might provide evidence which might identify him. Accordingly, because probable cause or individualized suspicion would be lacking relative to some future offense, the statute violates defendant's right to be free from unreasonable searches and seizures.

The fourth amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., amend. IV.) Its salutary purpose is to ensure "privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Labor Executives' Association* (1989), 489 U.S. 602, 613-14, 103 L. Ed. 2d 639, 657, 109 S. Ct. 1402, 1411.

As a threshold matter, we note that neither party disputes that the collection and testing of a blood sample from an individual pursuant to the statute at issue implicates the fourth amendment. (See *Skinner*, 489 U.S. at 616, 103 L. Ed. 2d at 659, 109 S. Ct. at 1413 ("obvious that *** physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable"); *Schmerber*, 384 U.S. at 767, 16 L. Ed. 2d at 918, 86 S. Ct. at 1834 (administration of blood tests constitutes a search of the person and depends antecedently upon seizures of persons within the meaning of the fourth amendment).) Nor do the parties dispute that the taking of saliva samples implicates fourth amendment concerns, although it seems that the level of intrusion necessary to obtain a saliva sample would on its face appear lower than that required for extracting blood. Because defendant focuses his

challenge primarily on the extraction of blood, we will assume for the purposes of our analysis that if the statutory taking of blood samples withstands constitutional scrutiny, it would stand to reason that taking saliva samples would likewise be upheld as reasonable.

We are of the view that the statutorily mandated taking of blood samples implicates the fourth amendment in two respects: first, drawing the blood sample intrudes on an individual's bodily integrity; and second, conducting additional analysis on the sample further implicates fourth amendment interests. (See *People v. Adams* (1992), 149 Ill. 2d 331, 340.) Accordingly, it is necessary to consider further whether the DNA sampling procedure satisfies the constitutional requirement of reasonableness.

It is well accepted that "the Fourth Amendment does not proscribe all searches and seizures, *** only those that are unreasonable." (*Skinner*, 489 U.S. at 619, 103 L. Ed. 2d at 661, 109 S. Ct. at 1414; *United States v. Sharpe* (1985), 470 U.S. 675, 682, 84 L. Ed. 2d 605, 613, 105 S. Ct. 1568, 1573.) "[T]he permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *Skinner*, 489 U.S. at 619, 103 L. Ed. 2d at 661, 109 S. Ct. at 1414, quoting *Delaware v. Prouse* (1979), 440 U.S. 648, 654, 59 L. Ed. 2d 660, 667-68, 99 S. Ct. 1391, 1396.

As we noted above, only two jurisdictions, thus far, have considered fourth amendment challenges to statutorily mandated DNA testing of convicted offenders. Although both jurisdictions have upheld the constitutionality of their respective statutes, the analytical basis for doing so has differed not only between the two jurisdictions, but there has also existed a difference of opinion among members of the respective courts.

A reading of *Jones*, at the appellate and trial levels, and *Olivas*, reveals that three approaches have been espoused as the appropriate constitutional basis on which to uphold the validity of DNA testing statutes similar to the one at issue in the present case: (1) "special needs" analysis (see *Jones v. Murray* (W.D. Va. 1991), 763 F. Supp. 842; *State v. Olivas* (1993), 122 Wash. 2d 73, 856 P.2d 1076 (majority view)); (2) diminished privacy rights of prisoners and probationers (*Jones v. Murray* (4th Cir. 1992), 962 F.2d 302); and (3) "traditional principles" of fourth amendment law (see *Olivas*, 122 Wash. 2d at 103, 856 P.2d at 1091 (concurring opinion); see also *Jones*, 962 F.2d at 313 (concurring opinion)). We will examine each of these approaches.

As a general principle of fourth amendment jurisprudence, the balance struck between an intrusion on an individual's fourth amendment interests and the promotion of a legitimate governmental

interest requires that a search or seizure be conducted under the authority of a warrant issued by a neutral magistrate upon a showing of probable cause. (*Adams*, 149 Ill. 2d at 341.) As an exception to the general rule, "special needs" analysis recognizes that the warrant and probable cause requirements are not always necessary to sustain the validity of a governmental intrusion challenged on fourth amendment grounds. (See *Adams*, 149 Ill. 2d at 341-42, citing *New Jersey v. T.L.O.* (1985), 469 U.S. 325, 340-41, 83 L. Ed. 2d 720, 733-34, 105 S. Ct. 733, 742.) Originally set forth in *T.L.O.*, and reiterated in subsequent cases, the exception states that "where a Fourth Amendment intrusion serves special governmental needs, *beyond the normal need for law enforcement*, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." (Emphasis added.) *National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 665-66, 103 L. Ed. 2d 685, 702, 109 S. Ct. 1384, 1390-91.

Concluding that special needs analysis was the better reasoned approach, a majority of the Supreme Court of Washington, with two justices concurring in the result only, upheld a statute allowing non-consensual blood extraction from convicted sex offenders for the purpose of DNA identification analysis. (*Olivas*, 122 Wash. 2d at 98, 856 P.2d at 1088.) Following a detailed review of the trial and appellate level decisions in *Jones*, the majority concluded that special needs analysis was superior because it affirmed general privacy rights by requiring the government to demonstrate a need "beyond normal law enforcement" before it could draw blood from convicted persons without probable cause or individualized suspicion. (*Olivas*, 122 Wash. 2d at 94, 856 P.2d at 1086.) Although the court expressly recognized that the explicit statutory purpose of DNA testing was for future identification and prosecution of criminal offenders, it was apparently persuaded by the district court's opinion in *Jones*, which identified the establishment of a DNA data bank for use in solving future crimes as a "special" law enforcement need (see *Jones*, 763 F. Supp. at 845). The court further concluded that the majority rationale set forth by the United States Court of Appeals for the Fourth Circuit in *Jones* was deficient because, by not requiring a special need, the appeals court had unnecessarily diminished the privacy rights of convicted persons. *Olivas*, 122 Wash. 2d at 94, 856 P.2d at 1086.

Because defendant raises no significant challenge to the warrantless nature of the search contemplated under section 5—4—3, instead focusing on the quantum of evidence necessary to support the intrusion, it is convenient to categorize the special needs cases into

two classes: (1) those that found at least some quantum of individualized suspicion extant or necessary (see *T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733 (school teacher's report that student was violating school rule prohibiting smoking); *Griffin v. Wisconsin* (1987), 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (tip from police officer that probationer's apartment contained guns); *O'Connor v. Ortega* (1987), 480 U.S. 709, 94 L. Ed. 2d 714, 107 S. Ct. 1492 (need to maintain workplace efficiency justified warrantless searches supported by reasonable suspicion)); and (2) those which have required no particularized suspicion as a predicate to the conduct of a warrantless search (see *Skinner*, 489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (drug testing of railway employees); *Von Raab*, 489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (drug testing of Federal employees)).

The dominant feature of cases utilizing special needs as an exception to the general warrant and probable cause requirements is the court's identification of an administrative justification independent of a law enforcement purpose. (See, *e.g.*, *T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733 (school discipline); *O'Connor*, 480 U.S. 709, 94 L. Ed. 2d 714, 107 S. Ct. 1492 (workplace efficiency); *Griffin* 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (supervision of probationers); *Skinner*, 489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (railway safety); *Von Raab*, 489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (integrity of drug interdiction personnel).) This is understandable because the special needs exception appears to be rooted in the administrative search doctrine. (See *T.L.O.*, 469 U.S. at 337, 83 L. Ed. 2d at 731, 105 S. Ct. at 740, citing *Camara v. Municipal Court* (1967), 387 U.S. 523, 536-37, 18 L. Ed. 2d 930, 940, 87 S. Ct. 1727, 1735.) Furthermore, where the court has upheld warrantless, suspicionless searches of bodily fluids, the court has clearly and unambiguously articulated the urgent and compelling nature of an administrative justification independent of a law enforcement purpose. (*Skinner*, 489 U.S. at 620, 103 L. Ed. 2d at 661-62, 109 S. Ct. at 1414-15; *Von Raab*, 489 U.S. at 666, 103 L. Ed. 2d at 702, 109 S. Ct. at 1391.) Moreover, in the employee drug testing cases, the court expressly noted the absence of a law enforcement purpose underlying the particular regulations at issue. See *Skinner*, 489 U.S. at 620-21, 103 L. Ed. 2d at 662, 109 S. Ct. 1415 ("FRA has prescribed toxicological tests, not to assist in the prosecution of employees but rather 'to prevent accidents' "); *Von Raab*, 489 U.S. at 666, 103 L. Ed. 2d at 702, 109 S. Ct. at 1391 (urine test results unavailable in a criminal prosecution of employee without employee's consent).

We note that the supreme court has upheld searches under the

special needs exception which produced evidence for use in a criminal proceeding. In those cases, however, the use of such evidence was allowed because the evidence was discovered incidental to a constitutionally permissible search under the special needs exception. See, *e.g.*, *T.L.O.*, 469 U.S. at 347, 83 L. Ed. 2d at 738, 105 S. Ct. at 745-46 (special need to maintain school discipline allowed school official's search of student's purse for evidence of school rule prohibiting cigarette smoking leading to discovery of controlled substance).

The second approach to examining the nonconsensual extraction of bodily fluids for the purpose of establishing a DNA data bank was articulated by the United States Circuit Court of Appeals for the Fourth Circuit in *Jones v. Murray* (4th Cir. 1992), 962 F.2d 302. Declining to apply the special needs exception, as the court below had done to uphold the validity of the statute (see *Jones*, 763 F. Supp. 842), the fourth circuit rejected a challenge to a Virginia statute which required all convicted felons, including sex offenders, to provide the State with a blood sample for DNA analysis and storage. (962 F.2d at 304.) Viewing the cases which involve the fourth amendment rights of prison inmates as a class of cases separate from those requiring a special need, the court reasoned that the diminished privacy rights of prisoners and probationers combined with the minimally intrusive nature of taking a blood sample were outweighed by the State's interest in determining identification characteristics for the purpose of improved law enforcement. *Jones*, 962 F.2d at 307.

Although the court indicated in a footnote that it found support for its holding "in the fact that the Supreme Court has not categorically required individualized suspicion" in every search which advances a law enforcement objective, the *Jones* majority relied principally on *Bell v. Wolfish* (1979), 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861, which upheld suspicionless body cavity searches of prison inmates following contact visits with persons from outside the institution (*Jones*, 962 F.2d at 307 n.2); *Hudson v. Palmer* (1984), 468 U.S. 517, 82 L. Ed. 2d 393, 104 S. Ct. 3194, where the court determined that a prison inmate had no reasonable expectation of privacy in his jail cell and thus was afforded no fourth amendment protection from random, suspicionless shakedown searches of his cell; and *Griffin v. Wisconsin* (1987), 483 U.S. 868, 871, 97 L. Ed. 2d 709, 716, 107 S. Ct. 3164, 3167, which upheld a warrantless search of a probationer's apartment following a tip from a police officer that the probationer's apartment contained guns. In upholding the searches in *Bell* and *Hudson*, the court stated that practical considerations related to prison administration necessitated the prison officials'

actions. (*Hudson*, 468 U.S. at 524, 82 L. Ed. 2d at 401, 104 S. Ct. at 3199; *Bell*, 441 U.S. at 546, 60 L. Ed. 2d at 473, 99 S. Ct. at 1877-78.) In *Griffin*, the court determined that the probation system's special need to supervise closely probationers provided sufficient justification to search a probationer's apartment on less than probable cause. *Griffin*, 483 U.S. at 875, 97 L. Ed. 2d at 718, 107 S. Ct. at 3169.

The third approach, articulated in both the *Jones* and *Olivas* concurring opinions, relies primarily on the perceived willingness of the United States Supreme Court, under certain circumstances, to relax or eliminate any requirement of probable cause or individualized suspicion where the nature of the intrusion occasioned by a particular search or seizure is minimal and the government's interest significant. (See *Michigan Department of State Police v. Sitz* (1990), 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481; see also *Skinner*, 489 U.S. at 638, 103 L. Ed. 2d at 673, 109 S. Ct. at 1424-25 (Marshall, J., dissenting); *Jones*, 962 F.2d at 313 (Murnaghan, J., concurring); *Olivas*, 122 Wash. 2d at 104, 856 P.2d at 1091 (Utter, J., concurring).) Under this approach, a reviewing court may balance the government's interest in conducting the search, the degree to which the search actually advances that interest, and the gravity of the intrusion upon personal privacy to determine whether the search is reasonable. (*Olivas*, 122 Wash. 2d at 105, 856 P.2d at 1092, citing *Brown v. Texas* (1979), 443 U.S. 47, 50-51, 61 L. Ed. 2d 357, 362, 99 S. Ct. 2637, 2640.) We disagree with defendant that *Sitz* is merely another case applying the special needs exception. In *Sitz*, the court expressly rejected the defendant's argument that the State was required to demonstrate a special governmental need "beyond normal law enforcement needs" before engaging in a balancing analysis. See *Sitz*, 496 U.S. at 450, 110 L. Ed. 2d at 420, 110 S. Ct. at 2485.

Although this approach has not been applied outside the context of police stops of motorists on public highways, and it requires us to interpret broadly existing precedent, we choose to follow it for several reasons. First, in the absence of a clearly articulated administrative justification independent of a law enforcement purpose, we are reluctant to extend the special needs line of cases to the present statute, which has an ostensible law enforcement purpose. Furthermore, it does not require us to identify some "special" or extranormal law enforcement need "beyond the normal needs of law enforcement."

Second, while the prisoner/probationer cases are instructive on the issue of individual privacy rights, these cases, in our view, are nothing more than special needs cases. (See, *e.g.*, *Bell*, 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (prison administration); *Griffin*, 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (probation supervision); see

also *Skinner*, 489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (court cites *Griffin* and *Bell* as examples of where it was willing to apply special needs exception). But see *Jones*, 962 F.2d 302 (prisoner/probationer cases are a distinct category).) Furthermore, practical considerations of prison administration, as an underlying justification, cannot be reconciled with the express language of section 5—4—3 which mandates taking samples regardless of whether the convicted sex offender is ultimately incarcerated. See Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3 (now codified, as amended, at 730 ILCS 5/5—4—3 (West 1992)).

Applying the third approach to the present circumstances, we conclude that the nonconsensual extraction of blood and saliva from persons convicted of the sex offenses enumerated in section 5—4—3 of the Unified Code of Corrections does not offend traditional fourth amendment principles. Although defendant raises no issue directed to the warrant requirement, we will touch upon it briefly in the interest of completeness.

The warrant requirement protects privacy interests by assuring citizens subject to a search or seizure that such intrusions are not random or arbitrary acts of government. (*Skinner*, 489 U.S. at 621-22, 103 L. Ed. 2d at 663, 109 S. Ct. at 1415-16.) It assures a citizen that the intrusion is authorized by law and that the search is narrowly limited in its objectives and scope. (*Skinner*, 489 U.S. at 622, 103 L. Ed. 2d at 663, 109 S. Ct. at 1416.) "A warrant *** provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case." *Skinner*, 489 U.S. at 622, 103 L. Ed. 2d at 663, 109 S. Ct. at 1416.

Section 5—4—3 adequately addresses the concerns underlying the warrant requirement. The statute provides for an objective determination because it entirely divests a court or public official of any discretion. The statute expressly mandates that "[a]ny person convicted of *** a sexual offense *** *shall* *** be required to submit specimens." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3(a) (now 730 ILCS 5/5—4—3(a) (West 1992)).) Its scope and objective are narrowly limited because it provides for nonconsensual sampling for the purpose of maintaining a data bank, and the information is kept strictly confidential and is made available only to law enforcement officials. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3(f) (now 730 ILCS 5/5—4—3(f) (West 1992)).) Furthermore, any risk that the statute might be applied in an arbitrary or oppressive fashion is precluded because its application is uniformly applied to a narrow class of individuals (*i.e.*, persons convicted of certain sex offenses). (Ill.

16

Rev. Stat. 1991, ch. 38, par. 1005—4—3(a) (now 730 ILCS 5/5—4—3(a) (West 1992)).) Accordingly, the requirement of a warrant would provide little, if any, additional protection in addition to the "assurances of certainty and regularity" already inherent in section 5—4—3. See *Skinner*, 489 U.S. at 624, 103 L. Ed. 2d at 664, 109 S. Ct. at 1417.

Having satisfied the warrant requirement, it is necessary to consider further whether the suspicionless nature of the sampling mandated under section 5—4—3 further runs afoul of the general principle requiring that searches and seizures be supported by probable cause. The mere fact that section 5—4—3 mandates warrantless, suspicionless sampling, however, does not necessarily render the search unreasonable because "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." *Skinner*, 489 U.S. at 624, 103 L. Ed. 2d at 664, 109 S. Ct. at 1417.

The physical intrusion imposed by the testing mandated under section 5—4—3 is relatively slight and poses no threat to the health or safety of the individual tested. (*Cf. People v. Adams* (1992), 149 Ill. 2d 331, 346 (statute mandating that persons convicted of certain offenses undergo blood testing for presence of HIV); see also *Schmerber*, 384 U.S. at 771, 16 L. Ed. 2d at 920, 86 S. Ct. at 1836; *Breithaupt v. Abram* (1957), 352 U.S. 432, 436, 1 L. Ed. 2d 448, 451, 77 S. Ct. 408, 410.) Furthermore, the collection of samples must be performed in a medically approved manner, and only certain qualified medical personnel are permitted to withdraw blood. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—4—3(d) (now 730 ILCS 5/5—4—3 (West 1992)).) Because the blood testing mandated under section 5—4—3 is minimally intrusive, it is necessary to balance the government's interest in conducting nonconsensual blood testing of convicted sex offenders, the degree to which section 5—4—3 furthers that interest, and the magnitude of the intrusion on a convicted sex offender's privacy rights.

It is beyond dispute that the State has a legitimate interest in deterring and prosecuting recidivist acts committed by sex offenders. Its interest is especially compelling when we consider that sex offenders frequently target children as their victims. Additionally, the State has an interest in establishing the identity of convicted sex offenders where traditional methods of identification might prove otherwise inadequate or inconclusive. Moreover, in addition to solving future crimes, the use of DNA evidence can be used to aid identification of repeat offenders who attempt to otherwise conceal or alter their identity. See *Jones*, 962 F.2d at 308.

The statutorily mandated DNA testing scheme is closely related to the State's interest in deterring and prosecuting recidivist acts committed by sex offenders because it provides an improved technological method for identifying and eliminating potential suspects.

Next, the privacy interest that a convicted sex offender has in his or her identity is minimal. The analogy to fingerprints is convincing because the blood and saliva sampling mandated under section 5—4—3 infringes on similar privacy interests. See *Olivas*, 122 Wash. 2d at 107, 856 P.2d at 1093 (Utter, J., concurring).

> "[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of 'booking' procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. *** While we do not accept even this small level of intrusion for free persons without Fourth Amendment constraint [citation], the same protections do not hold true for those lawfully confined to the custody of the state." *Jones*, 962 F.2d at 306.

Furthermore, to the extent that they are relevant in the present context, the prisoner/probationer cases lend persuasive support for the notion that convicted persons, although not ultimately incarcerated, maintain a diminished level of privacy rights as compared to free persons. Our supreme court has previously recognized that "offenders necessarily have reduced expectations of privacy." (*Adams*, 149 Ill. 2d at 348.) Similar to the HIV testing statute at issue in *Adams*, section 5—4—3 "operates only at that point in the proceedings when a defendant no longer enjoys a presumption of innocence but instead stands at the threshold of incarceration, probation, or other significant curtailment of personal freedom." (See *Adams*, 149 Ill. 2d at 348.) A person convicted of the sex offenses enumerated in section 5—4—3 is not compelled to provide blood and saliva samples unless a previous plea of guilty had been entered or that person was proved guilty of an enumerated offense beyond a reasonable doubt. Accordingly, because we consider the sampling mandated under section 5—4—3 as functionally equivalent to fingerprinting, which also necessarily intrudes a convicted sex offender's diminished privacy interest (*Olivas*, 122 Wash. 2d at 107, 856 P.2d at 1093), we hold that the suspicionless blood and saliva sampling of persons

convicted of the sex offenses enumerated in section 5—4—3, regardless of the sentence imposed, does not violate the fourth amendment prohibition against unreasonable searches and seizures. We recognize, however, that persons convicted of criminal offenses may not necessarily surrender all of their constitutional rights (see *Canedy v. Boardman* (7th Cir. 1994), 16 F.3d 183, 185) and accordingly limit our holding to the circumstances in the present case.

Defendant contends next that section 5—4—3 violates article I, section 6, of the Illinois Constitution of 1970. Defendant maintains that the express provision for protection against "invasion of privacy" in article I, section 6, necessarily affords convicted persons greater constitutional protection than the fourth amendment. Defendant cites no authority and presents no compelling argument in support of his contention that convicted sex offenders are afforded greater protection under our State Constitution than that provided under the United States Constitution. Instead, defendant relies solely on *King v. Ryan* (1992), 153 Ill. 2d 449, wherein the court struck down an implied consent statute which required motorists involved in an accident resulting in death or personal injury of any person to submit to suspicionless alcohol and drug testing.

We find *King* readily distinguishable. Unlike the statute at issue here, which mandates sampling after conviction, the statute in *King* allowed drug and alcohol testing when a motorist who was involved in an accident was neither charged with an offense nor was there probable cause to believe the motorist was intoxicated. (See *King*, 153 Ill. 2d at 464-65.) Additionally, in *Adams*, wherein HIV testing of certain sex offenders following conviction was upheld on fourth amendment and State constitutional grounds, the court expressed no opinion as to whether article I, section 6, of our State Constitution afforded convicted sex offenders any protection greater than that provided under the fourth amendment.

In the absence of any compelling argument from defendant, we decline to theorize on a question of uncertain constitutional dimension. Because any doubts concerning a statute's constitutionality will be resolved in favor of its validity (*Adams*, 149 Ill. 2d at 338), we hold that section 5—4—3 of the Unified Code of Corrections does not violate the prohibition against unreasonable searches or invasions of privacy contained in article I, section 6, of the 1970 Illinois Constitution.

For the foregoing reasons, we affirm the order of the circuit court compelling defendant to provide blood and saliva samples under the statutory mandate of section 5—4—3 of the Unified Code of Correc-

tions. Additionally, this court's order granting defendant a stay of enforcement of the circuit court's order pending appeal is vacated.

Affirmed; motion to stay pending appeal vacated.

McLAREN and PECCARELLI, JJ., concur.