OPINION
 

 Per Curiam:
 

 SUMMARY
 

 This case presents a significant issue of first impression— whether NRS 176.0913, a statute that authorizes DNA testing for certain enumerated criminal offenses, is constitutional. Additionally, this matter addresses whether the district court erred in refusing to credit appellant, Melvin Taylor Gaines (“Gaines”), for time served in custody on the various sentences imposed in the district court. For the reasons discussed herein, we conclude that NRS 176.0913 is constitutional and that the district court did not err with regard to Gaines’ sentences.
 

 STATEMENT OF FACTS
 

 Gaines faced felony criminal charges arising from three separate incidents. On April 7, 1998, Gaines pleaded guilty to the unlawful use of coins in a gaming machine, a felony, and was sentenced to twelve to forty-eight months (“case A”). The district court suspended this sentence and placed Gaines on probation for a term not to exceed four years.
 

 Several months later, while still on probation in connection with case A, Gaines was arrested for burglary and forgery arising from a failed attempt to cash three fake $100.00 Visa traveler’s checks at a Las Vegas casino (“case B”). Gaines’ probation in connection with case A was eventually revoked because of this arrest. While awaiting his probation revocation hearing on case A, Gaines was rebooked on a separate burglary charge stemming from a June 22, 1998, check forgery at a Las Vegas bank (“case C”).
 

 Gaines ultimately entered negotiated guilty pleas to one count of burglary and one count of forgery in case B, and one count of burglary in case C. Defense counsel discussed the terms of the agreement leading to these pleas of guilty during Gaines’ unconditional waiver of preliminary hearing:
 

 
 *363
 
 Another issue is the credit for time served. It’s discretionary as to whether or not he will get credit in these new cases or all go to this probation case.
 
 State has agreed to not oppose credit in all the cases for the time period that he has been booked on each case,
 
 which means that ....
 

 Which means that he will be getting this time now in his probation revocation hearing and in every other case.
 

 (Emphasis added.) Gaines’ plea agreement, however, stated in relevant part, that
 

 [t]he State has agreed to retain the right to argue at rendition of sentence, but will not oppose concurrent time between the burglary counts. The State will not oppose all discretionary time being given to defendant on all counts.
 

 Although the terms discussed at the waiver of preliminary hearing were in conflict with the actual written plea agreement, no attempt was made at the arraignment to remand the matter for preliminary hearing. Thus, Gaines proceeded with the plea negotiations as per the written agreement.
 

 Gaines was sentenced on December 22, 1998. With respect to case B, the district court imposed a sentence of seventy-two months with parole eligibility in fourteen months in connection with the burglary conviction, and thirty-four months with parole eligibility in twelve months in connection with the forgery conviction. With respect to case C, Gaines was sentenced to seventy months with parole eligibility in sixteen months. As of the date of sentencing, Gaines had been in custody since August 19, 1998— a total of 217 days. The sentences in cases B and C were imposed concurrently with the sentence imposed in case A, pursuant to which Gaines had been required to serve his original sentence of forty-eight months with parole eligibility in twelve months. The district court awarded 217 days credit for time served in case A, but gave no credit in connection with cases B and C. After the State objected to Gaines’ request for credit on all three cases, the following colloquy occurred:
 

 [Gaines’ Counsel]: The State is having no objection—
 

 The Court: I don’t think those were the negotiations because I can’t do that [credit each case for time served].
 

 [The State]: You can’t multiply the credit and apply it to each case. We have no opposition to the discretionary time.
 

 Additionally, the district court required Gaines to undergo DNA genetic marker testing. Believing that the district court erred in sentencing and that the genetic marker testing was unconstitutional, Gaines filed this timely appeal.
 

 
 *364
 

 DISCUSSION
 

 I.
 
 Credit for time served
 

 This court will not disturb a district court’s determination of sentencing absent an abuse of discretion.
 
 See
 
 Martinez v. State, 114 Nev. 735, 737-38, 961 P.2d 143, 145 (1998). In the instant matter, Gaines contends that the district court abused its discretion in not applying credit in cases B and C for the time that Gaines served in custody while being held for his probation violation in case A.
 
 [1]
 
 We disagree because the district court was prohibited under NRS 176.055 and the terms of the plea agreement from applying credit in cases B and C.
 

 NRS 176.055 provides, in relevant part:
 

 2. A defendant who is convicted of a subsequent offense which was committed while he was:
 

 (b) Imprisoned in a county jail or state prison or
 
 on probation or parole from a Nevada conviction is not eligible for any credit on the sentence for the subsequent offense for the time he has spent in confinement which is within the period of the prior sentence,
 
 regardless of whether any probation or parole has been formally revoked.
 

 (Emphasis added.) The plain and unequivocal language of NRS 176.055(2)(b) prohibits a district court from crediting a parolee or probationer for time served on a subsequent offense if such offense was committed while on probation or parole.
 

 
 *365
 
 Although Gaines does not dispute the plain meaning of NRS 176.055(2)(b), he argues that the district court erred in applying this statutory mandate because NRS 176.055 is ambiguous since it conflicts with NRS 176.035. We conclude that this argument lacks merit, as we see no conflict between these statutes.
 

 NRS 176.035(2) provides, in relevant part:
 

 If the person is a probationer at the time the subsequent felony is committed, the court may provide that the latter term of imprisonment run concurrently with any prior terms or portions thereof.
 

 This statute simply authorizes the district court to impose concurrent sentences in instances where a probationer commits a subsequent felony. We cannot agree with Gaines’ analysis that NRS 176.035 and 176.055 are in conflict.
 

 It is a well-recognized tenet of statutory construction that multiple legislative provisions be construed as a whole, and where possible, a statute should be read to give plain meaning to all of its parts.
 
 See
 
 Building & Constr. Trades v. Public Works, 108 Nev. 605, 610, 836 P.2d 633, 636 (1992). It is also well recognized that specific statutes take precedence over general statutes.
 
 See
 
 SHS v. Surman, 103 Nev. 366, 368, 741 P.2d 1357, 1359 (1987).
 

 In reading NRS chapter 176 as a whole, we have no trouble reconciling the two statutes at issue. NRS 176.035 merely authorizes the district court to run sentences concurrently; it does not require that these concurrent sentences be identical with respect to time served. Assuming arguendo that there is a conflict, we conclude that NRS 176.055 is controlling in this matter because it is more specific than NRS 176.035, as it deals with the factual circumstances concerning credit for time served.
 

 Gaines further argues that he is entitled to credit for time served on cases B and C under our holding in Kuykendall v. State, 112 Nev. 1285, 926 P.2d 781 (1996). We do not construe our holding in
 
 Kuykendall
 
 as a license to ignore the clear and unambiguous statutory mandate set forth in NRS 176.055.
 

 In
 
 Kuykendall,
 
 we held that NRS 176.055 should be read broadly to provide credit for confinement in instances where a defendant is financially unable to post bail.
 
 Id.
 
 at 1286, 926 P.2d at 782. Further, in
 
 Kuykendall,
 
 we noted
 
 that the
 
 purpose of NRS 176.055 was to ensure that a defendant was credited with all time served, in part, to prevent an equal protection violation—invidious discrimination based on a defendant’s financial status.
 
 Id.
 
 at 1286-87, 926 P.2d at 782-83. However, in so doing, we neither commented on NRS 176.035 nor intended to alter the unequivo
 
 *366
 
 cal prohibition of incarceration credit set forth in NRS 176.055(2)(b).
 

 Accordingly, we conclude that the district court did not err in the imposition of these sentences.
 

 II.
 
 NRS 176.0913
 

 Preliminarily, Gaines argues that NRS 176.0913, a statute requiring genetic marker testing for certain enumerated offenders, does not apply to him because the legislature only intended it to apply to sexual offenders.
 
 [2]
 
 We conclude that this contention lacks merit for a number of reasons.
 

 First, the plain language of NRS 176.0913 unambiguously requires genetic marker testing for several types of non-sexual offenders. Subsection 4 of this statute lists numerous non-sexual offenses for which genetic marker testing is required including: murder, mayhem, administration of poison, battery, elder abuse or neglect, home invasion, burglary, the offense at issue in this case, and others.
 

 Second, assuming there is any ambiguity in this language, the legislative history indicates that S.B. 325, codified as NRS 176.0913, is a manifestation of the 1997 legislature’s intent to, at least in part, expand the enumerated crimes for which DNA sampling and testing are to be required. Written materials submitted to the Senate Finance Committee in connection with S.B. 325 state unequivocally that
 

 [s]ubsection 4 expands the list of crimes for which genetic testing is required to include certain violent crimes such as
 
 *367
 
 murder, manslaughter, mayhem, battery with the intent to commit a crime, elder abuse, stalking, burglary, and invasion of the home.
 

 Hearing on S.B. 325 Before the Senate Finance Comm., 69th Leg., Ex. D, p. 18-19 (Nev., June 13, 1997).
 

 Third, the preamble of S.B. 325 states that it was intended, in part, “to expand the provisions relating to genetic marker testing of certain offenders.” 1997 Nev. Stat., ch. 451, preamble, at 1644.
 

 Gaines launches numerous constitutional attacks on NRS 176.0913, including claims that the statute is overbroad and that it violates his right to be free from unreasonable search and seizure, right to equal protection, right to due process, and right to be free from cruel and unusual punishment. Although we will address each constitutional argument in turn, we note preliminarily that all fifty states have enacted genetic marker testing statutes, and that appellate courts considering the constitutionality of these statutes have uniformly upheld them.
 
 See
 
 Landry v. Attorney General, 709 N.E.2d 1085, 1090 (Mass. 1999);
 
 see, e.g.,
 
 Roe v. Marcotte, 193 F.3d 72, 79 (2d Cir. 1999); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1996); Rise v. Oregon, 59 F.3d 1556, 1562 (9th Cir. 1995); Jones v. Murray, 962 F.2d 302, 308 (4th Cir. 1992); Vanderlinden v. Kansas, 874 F. Supp. 1210, 1215 (D. Kan. 1995); Kruger v. Erickson, 875 F. Supp. 583, 588-89 (D. Minn. 1995); Ryncarz v. Eikenberry, 824 F. Supp. 1493 (E.D. Wash. 1993); In the Matter of Maricopa County Juvenile Auth., 930 P.2d 496, 501 (Ariz. Ct. App. 1997); People v. Wealer, 636 N.E.2d 1129, 1137 (111. App. Ct. 1994); Cooper v. Gammon, 943 S.W.2d 699, 705 (Mo. Ct. App. 1997); In the Matter of Marcus Orozco, 878 P.2d 432, 435-36 (Or. Ct. App. 1994); State v. Olivas, 856 P.2d 1076, 1086 (Wash. 1993).
 

 Some genetic marker testing statutes are narrower than the Nevada provisions. Others are broader. For example, the Colorado provision applies only to sex offenders and the Virginia statute applies to all convicted felons.
 
 See Boling,
 
 101 F.3d at 1340, and
 
 Jones,
 
 962 F.2d at 308, respectively. Nationwide, appellate review of genetic marker provisions has focused primarily on whether such testing was unconstitutional as an unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution.
 

 A.
 
 Fourth Amendment
 

 It is undisputed that the involuntary collection of a blood sample from an offender constitutes a warrantless “search and seizure” for purposes of the Fourth Amendment that is not based
 
 *368
 
 on individualized suspicion of wrongdoing.
 
 See Landry,
 
 709 N.E.2d at 1090;
 
 see also
 
 Bolin v. State, 114 Nev. 503, 523, 960 P.2d 784, 798 (1998) (intruding “into the human body for the purpose of taking a blood sample constituted searches within the ambit of the Fourth Amendment and were thus subject to stringent probable cause requirements”). Given this fact, the issue then becomes whether this warrantless search is unreasonable, thereby violative of the Fourth Amendment.
 
 See Landry,
 
 709 N.E.2d at 1093.
 

 Courts that have considered this issue have taken two differing approaches in their Fourth Amendment analysis. First, some courts have applied a balancing approach weighing both the convict’s expectation of privacy and the minimally intrusive nature of a blood draw against the government’s interest in creating a genetic marker database to solve future crimes.
 
 See
 
 Jones v. Murray, 962 F.2d 302, 306 (4th Cir. 1992); Rise v. Oregon, 59 F.3d 1556, 1560 (9th Cir. 1995). Second, other courts have determined that genetic marker testing falls within the “special needs” doctrine that allows searches and seizures without a warrant and without individualized suspicion.
 
 [3]
 

 See
 
 State v. Olivas, 856 P.2d 1076, 1086 (Wash. 1999); Roe v. Marcotte, 193 F.3d 72, 79 (2d Cir. 1999).
 

 Because we deem the reasoning in the balancing approach more persuasive, we hold that NRS 176.0913 does not violate the Fourth Amendment because the State’s interest in solving crimes outweighs both the convict’s diminished expectation of privacy and the minimally intrusive nature of the blood draw.
 

 With respect to the balancing approach, the first consideration to be balanced against the State’s interest in the search and seizure
 
 *369
 
 at issue is the individual’s expectation of privacy. Many jurisdictions have recognized that a convicted person loses some rights to personal privacy that would otherwise be protected under the Fourth Amendment:
 

 Once a person is convicted of one of the felonies [enumerated in a genetic marker testing statute] his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from the blood sampling.
 

 Rise v. Oregon, 59 F.3d 1556, 1560 (9th Cir. 1995);
 
 see
 
 Jones v. Murray, 962 F.2d 302, 306 (4th Cir. 1992).
 

 Finally, the Supreme Court of the United States has held that a convicted person has a diminished expectation of privacy in the penal context. For example, in Hudson v. Palmer, 486 U.S. 517, 530 (1984), the Court held that persons lawfully convicted lose their right to privacy in routine searches of their jail cells.
 
 See Hudson,
 
 468 U.S. at 530 (discussing convicted felons’ diminished expectation of privacy). Further, the Supreme Court has held that even probationers lose their right to privacy in the search of their homes pursuant to an established law enforcement program.
 
 See
 
 Griffin v. Wisconsin, 483 U.S. 868, 880 (1987).
 

 Gaines argues, however, that limitations on convicted persons’ privacy rights are only permissible when maintaining order and security in a penal institution, and such privacy rights may not be diminished for the purpose set forth in the genetic marker testing statute—assisting the State in solving future crimes. A similar argument was rejected by the Ninth Circuit in
 
 Rise,
 
 where the court held that even when there is no legitimate penal interest:
 

 [T]he State may interfere with an individual’s Fourth Amendment interest with less than probable cause and without a warrant if the intrusion is only minimal and is justified by law enforcement purposes.
 

 Rise, 59
 
 F.3d at 1559 (citing Michigan State Police Dep’t v. Sitz, 496 U.S. 444, 450 (1990)). In sum, the overwhelming weight of authority supports the position that a convict has a diminished expectation of privacy in his identity, despite the fact that the State’s interest does not concern administration of penal or detention facilities.
 

 Another factor balanced against the government’s interest is the intrusive nature of the search. Courts considering Fourth Amendment challenges have determined that blood draws from convicted persons to gather genetic information for identification involve only a minimal intrusion.
 
 See, e.g., Rise, 59
 
 F.3d at 60;
 
 Jones,
 
 962 F.2d at 307. Most of these courts have relied on
 
 *370
 
 United States Supreme Court precedent, repeatedly concluding that a blood draw is not an “unduly extensive imposition,”
 
 see
 
 Winston v. Lee, 470 U.S. 753, 762 (1985), and that it “would not be considered offensive by even the most delicate,”
 
 see
 
 Breithaupt v. Abram, 352 U.S. 432, 436 (1957).
 
 See also
 
 Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 625 (1989) (blood tests do not “infringe significant privacy interests”); Schmerber v. California, 384 U.S. 757, 771 (1966) (noting that drawing blood is “commonplace”).
 

 Gaines further argues that there are greater protected privacy interests in an individual’s bodily fluids, and therefore a warrant and probable cause are always required before a blood draw absent exigent circumstances. Other courts have rejected similar arguments. In
 
 Rise,
 
 the court noted that the purpose of the warrant and probable cause requirement—to protect citizens from arbitrary acts of government by having a neutral magistrate evaluate whether the government’s intrusion was warranted—was satisfied under Oregon’s genetic marker statute because the statutory criteria were standardized, requiring conviction of a predicate offense before testing.
 
 Rise, 59
 
 E3d at 1561-62. Thus, there were ‘ ‘virtually no facts for a neutral magistrate to evaluate.’ ’
 
 Id.
 

 Similarly, the Nevada statutory criteria are standardized; certainly the statute objectively enumerates certain felonies for which DNA testing is prescribed. Thus, there would be no criteria for a magistrate to evaluate. We concur with the overwhelming weight of authority that the blood draw is a minimally intrusive search for which probable cause and a warrant are not always necessary.
 

 Courts have uniformly held that the government interest outweighs a convict’s diminished right for privacy in his genetic markers because such information provides law enforcement with a dramatic new tool that can be used to accurately identify a criminal suspect attempting to conceal his identity.
 
 See
 
 Jones v. Murray, 962 F.2d 302, 308 (4th Cir. 1992) (noting that a DNA test can exculpate an accused as much as it can implicate him); Landry v. Attorney General, 709 N.E.2d 1085, 1090 (Mass. 1999). Moreover, because of the high rate of recidivism among sexual and violent offenders, and because investigations of violent and sexual crimes are more likely to yield evidence from which DNA can be derived, compilation of DNA samples from violent and sexual offenders furthers the legislative purpose of solving future crimes.
 
 See Jones,
 
 962 F.2d at 308; Cooper v. Gammon, 943 S.W.2d 699, 704 (Mo. Ct. App. 1997).
 

 Gaines, however, argues that the State’s interest in testing his DNA is weak because he was not a violent felon. We conclude that this argument lacks merit. First, Gaines pleaded guilty to two counts of burglary, a felony enumerated in the statute for which
 
 *371
 
 genetic marker testing is required. Second, we note that burglary has been an included offense in some states’ genetic marker testing statutes because of its high recidivism rate.
 
 See Jones,
 
 962 F.2d at 314.
 

 B.
 
 Equal protection
 

 The Equal Protection Clause of the Fourteenth Amendment mandates that all persons similarly situated receive like treatment under the law.
 
 See Olivas,
 
 856 P.2d at 1087. An equal protection analysis first requires that the appropriate standard of judicial scrutiny be identified, and then that the statutory classification be considered under that appropriate level of scrutiny.
 
 See id.
 
 Strict scrutiny is applied in cases involving fundamental rights, such as privacy, marriage, or cases involving a suspect class.
 
 See id.
 
 Under the strict scrutiny approach, legislation should be sustained only if it is narrowly tailored and necessary to advance a compelling state interest.
 
 See id.
 
 In contrast, a lesser standard for reviewing equal protection challenges applies where the classification does not affect fundamental liberties. Under this level of scrutiny, legislation at issue will be upheld provided the challenged classification is rationally related to a legitimate governmental interest.
 
 See
 
 Sereika v. State, 114 Nev. 142, 143-45, 955 P.2d 175, 179 (1998).
 

 Gaines contends that this court should apply strict scrutiny because the statute implicates Gaines’ fundamental right to privacy. We disagree with this contention.
 
 [4]
 
 We hold that the “rational basis” level of scrutiny is applicable because a convicted person has no fundamental right to be free from DNA genetic marker testing.
 
 See Olivas,
 
 856 F2d at 1087 (citing Schmerber v.
 
 *372
 
 California, 384 U.S. 757 (1966), and Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602 (1989));
 
 see also
 
 Roe v. Marcotte, 193 F.3d 72, 83 (2d Cir. 1999); Boling v. Romer, 101 F.3d 1336, 1341 (10th Cir. 1996).
 

 In applying a rational basis standard, we conclude that NRS 176.0913 does not offend notions of equal protection because of the existence of a rational basis for requiring genetic marker testing, namely the apprehension of repeat and violent offenders.
 

 C.
 
 Due process
 

 Gaines also argues that the genetic marker statute violates substantive due process because the right to bodily privacy is a fundamental right and may be restricted only if the state is able to show both a compelling state interest and that the state has adopted the least restrictive means of effecting its purpose. We conclude that this contention lacks merit because, as stated previously, a defendant has no fundamental right to be free from a blood test and because there is a rational basis in support of NRS 176.0913.
 
 [5]
 

 See supra
 
 Section 11(B). Quite notably, the few appellate courts that have considered whether genetic marker testing violates an offender’s right to due process under the Fifth and Fourteenth Amendments have flatly rejected this argument.
 
 See
 
 Rise v. Oregon, 59 F.3d 1556, 1562-63 (9th Cir. 1995);
 
 Vanderlinden,
 
 874 F. Supp. 1210, 1215-16 (D. Kan. 1995); Kruger v. Erickson, 875 F. Supp. 583, 587 (D. Minn. 1995); Cooper v. Gammon, 943 S.W.2d 699, 705-06 (Mo. Ct. App. 1997).
 

 In concluding that genetic marker testing does not offend due process, these courts have relied exclusively on the Supreme Court’s holdings in Breithaupt v. Abram, 352 U.S. 432 (1957), and Schmerber v. California, 384 U.S. 757 (1966).
 
 See Kruger,
 
 875 F. Supp. at 587 (citing
 
 Breithaupt,
 
 352 U.S. at 433-37);
 
 Rise,
 
 59 F.3d at 1562-63 (citing
 
 Breithaupt,
 
 352 U.S. at 435, and
 
 Schmerber,
 
 384 U.S. at 759-60);
 
 Cooper,
 
 943 S.W.2d at 705-06 (citing
 
 Schmerber,
 
 384 U.S. at 759-60, and
 
 Breithaupt,
 
 352 U.S. at 435). In
 
 Schmerber
 
 and
 
 Breithaupt,
 
 the Supreme Court con-
 
 *373
 
 eluded that the proper taking of a blood sample for purposes of a criminal investigation does not offend due process because it did not shock the conscience or offend one’s sense of justice.
 
 See id.
 
 Accordingly, under this approach, the Due Process Clause is not implicated because the blood test is routine, and therefore does not concern a fundamental right. We concur with the Supreme Court’s analysis. NRS 176.0913 does not offend due process.
 

 D.
 
 Eighth Amendment
 

 Gaines also argues that genetic marker testing violates the Eighth Amendment, which prohibits cruel and unusual punishment, because it essentially constitutes scientific experimentation and may result in the use of excessive force. We conclude that this argument lacks merit.
 

 The Eighth Amendment prohibits barbarous physical punishment and the “unnecessary and wanton infliction of pain” without justification.
 
 See
 
 Whitley v. Albers, 475 U.S. 312, 319 (1986). As previously discussed, the Supreme Court has determined that blood tests are not an ‘ ‘unduly extensive imposition’ ’ and “would not be considered offensive by even the most delicate.” Winston v. Lee, 470 U.S. 753, 762 (1985);
 
 see also Breithaupt,
 
 352 U.S. at 436. In light of the holdings in
 
 Winston
 
 and
 
 Breithaupt,
 
 we cannot conclude that a blood test properly performed by a medical provider is barbarous or involves wanton physical punishment. Other courts that have considered whether genetic marker testing violated the Eighth Amendment have concluded likewise.
 
 See
 
 Kruger v. Erickson, 875 F. Supp. 583, 587 (D. Minn. 1995); Ryncarz v. Elkenberry, 824 F. Supp. 1493, 1500-01 (E.D. Wash. 1993).
 

 Accordingly, we conclude that the blood draw authorized by NRS 176.0913 does not violate the Eighth Amendment.
 

 E.
 
 Overbreadth
 

 Gaines argues that NRS 176.0913 is overbroad because there are no restrictions on the amount of blood drawn, the testing of the blood, the time period for keeping the test results, and no requirement that the State dispose of the remaining portions of blood not used in the DNA testing. Essentially, Gaines is concerned that the State will use the DNA test results for a discriminatory or invasive purpose, such as determining a convict’s predisposition to physical or mental disease.
 

 The plain language of NRS 176.0913 limits the purpose of testing to identification.
 
 See
 
 subsection 1(b) (mandating that the sam
 
 *374
 
 pies be used for “determining] the genetic markers of the blood”). Further, Gaines’ contentions concerning abuse of the genetic marker data are merely speculation and conjecture, as he has provided this court with no evidence regarding such abuse. Finally, we note that the Supreme Court of the United States has rejected an analogous argument:
 

 While this procedure [collection of blood and urine for mandatory drug testing] permits the Government to learn certain private medical facts that an employee might prefer not to disclose, there is no indication that the Government does not treat this information as confidential, or that it uses the information for any other purpose.
 

 Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 626 n.6 (1989).
 

 Accordingly, we conclude that NRS 176.0913 is not overbroad.
 

 CONCLUSION
 

 We conclude that the district court did not err in refusing to credit Gaines for time served in his three separate cases. We further conclude that NRS 176.0913 is constitutional.
 

 [1]
 

 In a related argument, Gaines contends that the State breached the plea negotiations when it opposed discretionary time in all of his cases. We disagree that the State breached its plea agreement with Gaines.
 

 With respect to plea agreements, this court has concluded that the State must be held to “ ‘the most meticulous standards of both promise and performance’ ” and that violation of the terms or the “spirit” of a plea agreement mandates reversal. Citti v. State, 107 Nev. 89, 91, 807 P.2d 724, 726 (1991) (quoting Van Buskirk v. State, 102 Nev. 241, 243 , 720 P.2d 1215, 1216 (1986)).
 

 Although Gaines argues that the State implicitly agreed not to oppose credit for time Gaines served in cases A-C at his waiver of preliminary hearing, Games’ written guilty plea agreement provided only that “the State will not oppose all discretionary time being given to defendant on all counts.” We conclude that the State met this obligation under the plea agreement because it did not oppose any discretionary time. Although the State objected to credit for time served on cases B and C, this did not violate Gaines’ plea agreement because such credit was not discretionary. Rather, the credit was prohibited by statute.
 
 See
 
 NRS 176.055. Further, Gaines’ remedy would have been to abandon the negotiations at his arraignment in district court in light of the conflict in understandings and seek a remand to the justice court for renewed preliminary hearing proceedings.
 

 [2]
 

 Gaines also argues NRS 176.0913 is ambiguous because subsections 4(b) and 4© conflict since 4(b) references a statute that defines the term “sexual offense,” in part to include a hearing requirement, whereas subsection 4© includes no such hearing requirement.
 
 See
 
 NRS 179D.410(17) (defining a sexual offense as “An offense that is determined to be sexually motivated pursuant to NRS 175.547 or NRS 207.193 [statutes mandating hearings]”). We see no inherent ambiguity between these subsections. The hearing referenced indirectly in subsection 4(b) is only held to ascertain whether an offense is sexually motivated—not to determine whether DNA genetic marker testing is required.
 
 See
 
 NRS 175.547 and NRS 207.193. Accordingly, because there is no hearing requirement prior to genetic marker testing for both subsection 4(b) and 4(j), there is no conflict.
 

 Further, Gaines contends that the statute is ambiguous because NRS 179A.075, which defines the duties of the central depository, only authorizes the depository to collect genetic marker information from (hose convicted of sexual offenses. We conclude that this argument lacks merit. Although NRS 179A.075(3) was not broadened to authorize both the criminal justice agencies and the central depository to collect and submit genetic marker information from those convicted of non-sexual offenses, such authority was provided for in subsection 1 of NRS 176.0913.
 
 See
 
 NRS 176.0913(l)(a) (requiring that “information identifying the defendant be submitted to the central repository for Nevada records of criminal history”).
 

 [3]
 

 The “special needs” exception to the Fourth Amendment warrant requirement mandates a showing that: (1) the search was reasonable; and (2) that a warrant would be impracticable and would frustrate the government’s interest in a special need beyond normal law enforcement.
 
 See Olivas,
 
 856 P.2d at 1084. With regard to prong one, courts have concluded that a blood draw was reasonable in certain contexts based on prior Supreme Court precedent discussing the minimal intrusiveness of the blood draw.
 
 See id.
 
 (citing Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 620-24 (1989), and National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665-72 (1989));
 
 cf. Roe,
 
 193 F.3d at 76-77. With regard to prong two, these courts have concluded that genetic marker testing was a special need beyond law enforcement because the creation of a genetic marker data bank would provide a strong deterrent against recidivist acts, and therefore its purpose was not for “normal” law enforcement.
 
 See Olivas,
 
 856 P.2d at 1085;
 
 Roe,
 
 193 F.3d at 79.
 

 [4]
 

 In so doing, we recognize that at least one court has applied strict scrutiny in evaluating a genetic marker testing statute under the Equal Protection Clause.
 
 See
 
 Vanderlinden v. Kansas, 874 F. Supp. 1210, 1217 (D. Kan. 1995) (holding that because privacy rights were implicated by genetic marker testing, the application of strict scrutiny was warranted). However, even in
 
 Vanderlinden,
 
 where the strict scrutiny standard was applied, the court concluded that the genetic marker testing statute did not violate the Equal Protection Clause because it advanced a compelling state interest:
 

 Rather than imposing an improper burden on a suspect class, the Kansas statute finds its focus on that group of felons who are most likely as repeat offenders to commit the type of crime in which DNA may be left. The state interest in advancing law enforcement is significant, and while the DNA databank surely will not positively identify the perpetrator of every crime, its value should not be dismissed lightly. The court finds the statute is narrowly drawn, advances a compelling state interest, and does not violate equal protection principles.
 

 Id.
 

 [5]
 

 We note that the
 
 Vanderlinden
 
 court concluded that genetic marker testing implicated a fundamental privacy right, and thus a statute authorizing such testing must be narrowly drawn and supported by a compelling state interest.
 
 See Vanderlinden,
 
 874 F. Supp. at 1215-16. Despite the fact that the genetic marker testing statute was subject to this heightened standard of review, the
 
 Vanderlinden
 
 court concluded that it did not offend due process because it was narrowly drawn and because the State had a compelling law enforcement interest in solving crimes.
 
 Id.
 
 at 1215.