[No. A079943. First Dist., Div. One. Aug. 14, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EDWARD KING, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

1364

**COUNSEL**

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Enid A. Camps, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEIN, J.**—On May 28, 1997, a jury returned a verdict finding appellant James Edward King guilty of murder with special circumstances, first degree burglary, sodomy and attempted rape. The jury did not, however, find that appellant's crimes warranted the death penalty. The trial court accordingly sentenced appellant to life in prison without the possibility of parole consecutive to a determinate term of 30 years.

In appealing his conviction and sentence, appellant does not deny that he in fact committed the crimes. He contends, rather, that the jury's findings were based on inadmissible evidence; specifically evidence of deoxyribonucleic acid (DNA) profiling matching appellant's DNA profile with that of

DNA recovered from the crime site, and evidence of statements taken from appellant after his arrest for the crimes.[1]

## BACKGROUND

Appellant had been convicted of forcible rape in 1984, for which he served a term in state prison.[2] In January 1991, before appellant's release, and as required by former Penal Code section 290.2, appellant provided blood samples for analysis by a DNA laboratory operated by California's Department of Justice (the DNA Lab). The samples provided by appellant were analyzed, a profile was developed, and the profile was placed in the DNA Lab's data bank.

On September 28, 1992, approximately nine months after appellant's release from prison, the body of 76-year-old Leticia Smith was found in the living room of her home. The cause of death was strangulation, apparently by means of a ligature fashioned from a pair of pantyhose. The victim had suffered blunt trauma injuries to her head and face, and it appeared that she had been sexually assaulted. Fluids from the victim's genital and anal area were collected and analyzed. The anal smears contained sperm.

The DNA Lab was not fully funded at that time, and no attempt was made to match the DNA recovered from the crime scene with profiles, such as that developed from the samples provided by appellant, maintained in the DNA Lab's data bank. In early 1995, however, samples of blood and sperm recovered from the crime scene were forwarded to the DNA Lab for analysis. Comparisons were made, and the profile of the DNA from the crime scene was found to match the DNA profile from the samples collected from appellant in 1991. Additional procedures were run on a semen stain recovered from the victim's bathrobe and on blood drawn from appellant in

---

[1] Appellant originally also contended that the trial court erred in admitting evidence of statistical probabilities calculated by means of the "unmodified product rule." After appellant filed his opening brief, the California Supreme Court decided *People v. Soto* (1999) 21 Cal.4th 512 [88 Cal.Rptr.2d 34, 981 P.2d 958], holding such evidence to be admissible. Appellant accordingly concedes the point, and we do not address it further.

[2] The 1984 offense was not appellant's first brush with the criminal justice system. In 1971, while a juvenile, he exposed himself, an offense that resulted in his commitment to a boys' school. The following year, while on a good conduct leave from the school, appellant raped a teacher in her classroom and stole $6 from her. The year after that, after receiving a one-hour pass from football practice, appellant went to a neighboring Veterans Administration hospital, where he attempted to rape a woman. Less than two years later he committed an offense that resulted in a conviction of rape, attempted rape and armed robbery. In October 1979, 19 months after his release from prison, appellant kidnapped a 16-year-old girl, raped her and forced her to orally copulate him. In 1984, he was convicted of forcible rape.

1995. Again, the DNA profiles matched. There was evidence that the statistical likelihood that a Caucasian would have a particular profile is one in 150 trillion, that a Black person would have a particular profile is one in 800 trillion, and that a Hispanic person would have a particular profile is one in 170 trillion.[3, 4]

Appellant was arrested on March 6, 1995. He was interrogated on the same day, and again on March 7, 1995. During the second day of interrogation, appellant essentially admitted that he had been in the home of the victim on the day of her murder, had struggled with her, and knew that he had injured her. He stated that he had no memory of any sexual assault.

DISCUSSION

I.

*Appellant's Fourth Amendment Challenge to Former Penal Code Section 290.2*

*Former Penal Code Section 290.2*

Penal Code former section 290.2, as in effect in 1991, required persons convicted of specified sex offenses, including rape, or of murder or felony assault and battery, and who were "discharged or paroled from" a "state prison, county jail, or any institution," to "provide two specimens of blood and a saliva sample." It provided that the blood should be withdrawn in a medically approved manner. It required the Department of Justice to perform a DNA analysis on the specimens, and provided that "DNA analysis and other genetic typing analysis" could be used only for law enforcement purposes. It authorized the Department of Justice to maintain a computerized data bank system for the purposes of filing DNA and other genetic typing information, and prohibited the inclusion of such information in the state summary criminal history information. The data could be collected only from the individuals convicted of the specified crimes or from crime scenes. Evidence taken from a crime scene was to be "stricken from the data bank when it is determined that the person is no longer a suspect in the case." (Pen. Code, § 290.2; Stats. 1989, ch. 1304, § 1.5, pp. 5176-5178.) DNA or

[3]The likelihood that a particular profile would show up in the Department of Justice's database also was calculated as one in 150 billion, one in 800 billion and one in 170 billion for Caucasians, Blacks and Hispanics, respectively.

[4]For a complete discussion of DNA analysis, the methods used to obtain a DNA profile and theories determining statistical likelihood that a particular profile exists in a particular population, see *People v. Soto, supra,* 21 Cal.4th at pages 519-526.

other genetic typing information could be disseminated only to law enforcement agencies and district attorney offices, or to defense counsel for defense purposes in compliance with discovery. (Pen. Code, former § 290.2, subds. (e), (g).)

Penal Code former section 290.2 was amended in 1993 to permit the use of samples by local public DNA laboratories, and to permit dissemination of genetic typing information to Department of Corrections parole officers and parole authority hearing officers. (Stats. 1993, ch. 457, § 1, p. 2539; Stats. 1994, 1st Ex. Sess. 1993-1994, ch. 42, §§ 1, 2.) In 1996, Penal Code former section 290.2 again was amended to change the time for providing samples from the time of release to the time of commitment to a specified institution. (Stats. 1996, ch. 917, § 2.) Penal Code former section 290.2 was repealed in 1998, and reenacted, with modifications, in Penal Code section 295 et seq. (Stats. 1998, ch. 696, § 2.) The new legislation has expanded the class of persons required to provide samples for DNA testing, and requires such persons to provide replacement specimens if the original samples prove to be unusable. (Pen. Code, §§ 296-296.2.) We, however, are not concerned with whether the state legitimately can require all such persons to provide samples, or whether persons who are not incarcerated may be required to provide samples or replace samples taken while they were in a penal institution. ■ We determine only whether one such as appellant, imprisoned for having committed a crime involving a sexual assault, might be required to provide samples of blood and saliva for DNA analysis in accordance with the procedures outlined in former Penal Code former section 290.2. It is noteworthy that although all 50 states have enacted laws comparable to California's DNA profiling laws, and although a number of other jurisdictions have considered the question of whether such laws violate Fourth Amendment principles, and have used any of several theories to resolve that question, appellant has been unable to cite one that has resolved it against DNA profiling.

*The Fourth Amendment*

■ It is not disputed that the nonconsensual extraction of blood is an invasion of the rights protected by the Fourth Amendment of the United States Constitution.[5] It also is true that even less intrusive methods of collecting samples, and the ensuing chemical analysis of such samples to obtain physiological data, implicate Fourth Amendment privacy interests. (*Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 616-617

---

[5]The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[109 S.Ct. 1402, 1412-1413, 103 L.Ed.2d 639]; see also *Schmerber v. California* (1966) 384 U.S. 757, 767 [86 S.Ct. 1826, 1833-1834, 16 L.Ed.2d 908].) It also is true, however, that to find the Fourth Amendment applicable to the procedures at issue here "is only to begin the inquiry into the standards governing such intrusions. [Citations.] For the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." (*Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. at p. 619 [109 S.Ct. at p. 1414].)

*Necessity of a Warrant Issued Upon Probable Cause*

As a general rule, the question of whether a particular practice is unreasonable, and thus violates the Fourth Amendment, " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " (*Skinner v. Railway Labor Executives' Assn., supra,* at p. 619 [109 S.Ct. at p. 1414], quoting from *Delaware v. Prouse* (1979) 440 U.S. 648, 654 [99 S.Ct. 1391, 1396, 59 L.Ed.2d 660], and *United States v. Martinez-Fuerte* (1976) 428 U.S. 543 [96 S.Ct. 3074, 49 L.Ed.2d 1116].) "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (*Bell v. Wolfish* (1979) 441 U.S. 520, 559 [99 S.Ct. 1861, 1884, 60 L.Ed.2d 447].)

▉▉ Appellant contends, however, that it is improper to engage in such a balancing test here. His position is that the general rule is that a search may be initiated only after a warrant has been issued upon probable cause, and that a court should engage in the balancing test only if it first determines that the case falls within a recognized exception to the general rule. ▉▉ Appellant's contention is developed from language in *Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. at page 619 [109 S.Ct. at page 1414], where the court, after recognizing the need to balance the relevant interests, found: "In most criminal cases, we strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment. [Citations.] Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause. [Citations.] We have recognized exceptions to this rule, however, 'when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." ' [Citations.] When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context. [Citations.]" The "special needs" exception was again recognized by the Supreme Court in *Treasury Employees v. Von Raab* (1989) 489 U.S. 656, 665-666 [109 S.Ct. 1384, 1390-1391,

103 L.Ed.2d 685]: "[O]ur cases establish that where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."

■ According to appellant, the DNA testing here is done only to further the "normal need for law enforcement." It follows that neither the "special needs" exception, nor any other recognized exception to the warrant and probable cause requirement exists, and it therefore is unnecessary and improper to engage in a balancing of the competing interests. We disagree. Cases such as *Skinner* and *Von Raab* do no more than recognize that the competing interests do not vary in the vast majority of Fourth Amendment cases; i.e., in most criminal investigations. It therefore is unnecessary in "most criminal cases" to balance the competing interests, because the balance in such cases already has been struck in favor of the procedures described by the warrant clause of the Fourth Amendment. The circumstances in cases such as *Skinner* and *Von Raab,* however, or in the other recognized "exceptions," are significantly different from those in a typical criminal investigation. The balance that has been struck in "most criminal cases," therefore, is not necessarily the balance that should be struck in these cases. ■ The Supreme Court in *Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646 [115 S.Ct. 2386, 132 L.Ed.2d 564]—another "special needs" case, explained: "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.' At least in a case such as this, where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard ' "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." ' [Citations.]" (*Id.* at pp. 652-653 [115 S.Ct. at p. 2390], fn. omitted.)

■ The typical criminal case is one where a crime has been committed, an investigation has been initiated and the investigators are attempting to gather evidence for the purpose of solving a particular crime or to build a case against a particular individual. The investigators exercise great discretion, deciding who to investigate, how to conduct that investigation, and what, if anything, should be seized as evidence. At the very least, such searches inconvenience involved persons. There also is a substantial likelihood that such a search will generate fear and surprise in persons who, as a result of the search, reasonably may believe that they have become the focus

of a police investigation. This is not the situation, however, when the "search" is the securing of blood and saliva samples for DNA analysis and profiling. The samples are not taken as part of an investigation of a particular crime. The decision to obtain a sample from a particular person is not subject to official discretion. There is no focus on a particular person. As those who are required to provide samples doubtless know, every person of the specified class is required to provide a sample. The person supplying the samples therefore has no reason to fear that the intrusion suggests a belief by the authorities that he or she has committed any criminal offense, or that he or she may be subjected to any further investigation. The fact that the person is already incarcerated also tends to reduce the inconvenience of having to go to a particular place to provide samples.

There is little reason to require a warrant in such circumstances. ▮ A judicial warrant is a necessary component of the "normal need for law enforcement," because it protects privacy interests "by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope. [Citations.] A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case." (*Skinner v. Railway Labor Executives' Assn., supra*, 489 U.S. at pp. 621-622 [109 S.Ct. at pp. 1415-1416]; see also *Treasury Employees v. Von Raab, supra*, 489 U.S. at p. 666 [109 S.Ct. at p. 1391].) ▮ A warrant, however, provides little or no additional protection to personal privacy when, as in the present case, the circumstances justifying the testing and the permissible limits of the intrusion are defined narrowly and specifically, these circumstances doubtless are well-known to those in the class of persons to be tested, and the decision to test is not discretionary and thus is not based on a judgment that certain conditions are present. In such circumstances "there are simply 'no special facts for a neutral magistrate to evaluate,' " and it is reasonable to dispense with the warrant requirement. (*Treasury Employees v. Von Raab, supra,* 489 U.S. at p. 667 [109 S.Ct. at p. 1391]; see also *Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. at p. 622 [109 S.Ct. at p. 1416].)

▮ It still is true that as a general rule, even a warrantless search must be conducted only on probable cause to believe that the person searched has violated the law, or at least there must be some quantum of individualized suspicion before it can be concluded that a search is reasonable. (*Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. at p. 624 [109 S.Ct. at p. 1417].) Nonetheless, "We made it clear . . . that a showing of individualized suspicion is not a constitutional floor, below which a search must be

presumed unreasonable. [Citation.] In limited circumstances, where the privacy interests implicated by a search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." (*Id.* at p. 624 [109 S.Ct. at p. 1417]; see also *Vernonia School Dist. 47J v. Acton, supra,* 515 U.S. at p. 653 [115 S.Ct. at pp. 2390-2391].) Such circumstances exist here.

■ Although prisons are not beyond the reach of the Constitution, "it is also clear that imprisonment carries with it the circumspection or loss of many significant rights." (*Hudson v. Palmer* (1984) 468 U.S. 517, 523-524 [104 S.Ct. 3194, 3199, 82 L.Ed.2d 393].) The nature of confinement necessarily results in a significant reduction in the expectation of privacy. It is settled, for example, that prisoners have no privacy interests in their cells. (*Id.* at p. 526 [104 S.Ct. at p. 3200].) Even pretrial detainees can have no reasonable expectation of privacy with respect to their rooms or cells. (*Bell v. Wolfish, supra,* 441 U.S. at p. 557 [99 S.Ct. at pp. 1883-1884].) The privacy interests of inmates in their own bodies bow to the interests of prison officials in ensuring that weapons or contraband are not brought into prison institutions, and inmates therefore may be required to expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the institution. (*Id.* at p. 560 [99 S.Ct. at pp. 1885].) Persons convicted of sex offenses are required to provide blood samples for purposes of testing for acquired immune deficiency syndrome (AIDS). (Pen. Code, § 1202.1.) Probationers enjoy only conditional liberty properly dependent on observance of special probation restrictions, and their homes are subject to warrantless searches on less than probable cause. (*Griffin v. Wisconsin* (1987) 483 U.S. 868, 873-875 [107 S.Ct. 3164, 3168-3169, 97 L.Ed.2d 709].)

■ The reduction in a convicted person's reasonable expectation of privacy specifically extends to that person's identity. Indeed, not only persons convicted of crimes, but also those merely suspected of crimes, routinely are required to undergo fingerprinting for identification purposes. As to convicted persons, there is no question but that the state's interest extends to maintaining a permanent record of identity to be used as an aid in solving past and future crimes, and this interest overcomes any privacy rights the individual might retain. "This becomes readily apparent when we consider the universal approbation of 'booking' procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. Thus a tax evader is fingerprinted just the same as a burglar. While we do not accept even this small level of intrusion for free persons without Fourth

Amendment constraint [citation], the same protections do not hold true for those lawfully confined to the custody of the state." (*Jones v. Murray* (4th Cir.1992) 962 F.2d 302, 306; and see *Rise v. State of Oregon* (9th Cir. 1995) 59 F.3d 1556, 1559-1560 and *People v. Wealer* (1994) 264 Ill.App.3d 6 [201 Ill.Dec. 697, 636 N.E.2d 1129, 1136-1137].) The fingerprints, photographs and physical descriptions of convicted persons are preserved as a matter of routine. And once an individual has been convicted of a crime or crimes, and has been incarcerated in a penal institution, his or her identity clearly becomes a matter of interest to prison officials. It further is true that sex offenders such as appellant are required to register annually with the police for the remainder of their lives. (Pen. Code, § 290.) "The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.' [Citation.] What expectations are legitimate varies, of course, with context [citation], depending, for example upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." (*Vernonia School Dist. 47J v. Acton, supra,* 515 U.S. at p. 654 [115 S.Ct. at p. 2391].) By their commissions of a crime and subsequent convictions, persons such as appellant have forfeited any legitimate expectation of privacy in their identities. In short, any argument that Fourth Amendment privacy interests do not prohibit gathering information concerning identity from the person of one who has been convicted of a serious crime, or of retaining that information for crime enforcement purposes, is an argument that long ago was resolved in favor of the government.[6]

On the other hand, the government has an undeniable interest in crime prevention. It has interests in solving crimes that have been committed, in bringing the perpetrators to justice and in preventing, or at least discouraging, them from committing additional crimes. The government also has an interest in ensuring that innocent persons are not needlessly investigated—to say nothing of convicted—of crimes they did not commit.[7] DNA testing unquestionably furthers these interests. The ability to match DNA profiles derived from crime scene evidence to DNA profiles in an existing data bank can enable law enforcement personnel to solve crimes expeditiously and

---

[6]Appellant voices concerns that once DNA profiling is permitted for one purpose, it creates the possibility of misuse and makes it that much easier to permit DNA profiling for other purposes. It is enough that Penal Code former section 290.2 limited the use of DNA evidence, prohibiting its use for anything other than law enforcement purposes. Whether it constitutionally might be used for some other purpose is a question that is not before us.

[7]The Legislature has expressed the purpose of the DNA testing procedures as "to assist federal, state, and local criminal justice and law enforcement agencies within and outside California in the expeditious detection and prosecution of individuals responsible for sex offenses and other violent crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children." (Pen. Code, § 295, subd. (c).)

prevent needless interference with the privacy interests of innocent persons. It has been suggested that DNA profiling may act as a deterrent to future criminal activity. (*Roe v. Marcotte* (2d Cir. 1999) 193 F.3d 72, 79.) It also is an unfortunate truth that many offenders commit more than one crime, and recidivism is common. (See *Jones v. Murray, supra,* 962 F.2d at p. 306, taking notice of studies establishing the probability that persons arrested for serious crimes have committed past crimes and the statistical likelihood that such persons will commit crimes in the future.) Speedy identification and apprehension of an offender, therefore, will prevent crime even if DNA testing has no deterrent effect on criminal activity.

The Supreme Court in *Skinner, Von Raab, Vernonia,* and also in *New Jersey v. T. L. O.* (1985) 469 U.S. 325 [105 S.Ct. 733, 83 L.Ed.2d 720], concluded that the usual requirements of a judicial warrant issued upon probable cause were not applicable because the intrusion on privacy interests in those cases was less than that involved in most criminal cases and the governmental interest involved "special needs beyond the normal need for law enforcement." We do not believe, however, that these cases stand for the proposition that the "usual requirements" apply in all other cases. In *Michigan Dept. of State Police v. Sitz* (1990) 496 U.S. 444 [110 S.Ct. 2481, 110 L.Ed.2d 412], for example, the court upheld a sobriety checkpoint program that required authorities to stop all vehicles passing through a checkpoint and briefly to examine their drivers for signs of intoxication. ▪ The magnitude of the drunk driving problem coupled with the slight intrusion on motorists stopped briefly at sobriety checkpoints justified a departure from the requirement of a warrant on particularized suspicion. (*Id.* at p. 451 [110 S.Ct. at pp. 2485-2486].) These cases, and others, teach that the relevant inquiry is not whether the circumstances of a particular search fall within the specific "exception" to ordinary Fourth Amendment requirements recognized in an individual case, but whether the privacy interests and the governmental interests at stake so differ from those involved in normal law enforcement, that they justify a departure from the established requirement of a judicial warrant issued upon probable cause.

▪ It therefore is unnecessary to determine if the taking of samples for DNA analysis might be deemed to answer to "special needs," beyond the normal need for law enforcement (see *Roe v. Marcotte, supra,* 193 F.3d at p. 79 and *State v. Olivas* (1993) 122 Wash.2d 73 [856 P.2d 1076, 1086] (maj. opn.)), or if it presents a separate category of search to which the per se requirement of probable cause does not apply. (See *Jones v. Murray, supra,* 962 F.2d at pp. 306-307, including fn. 2 and *People v. Wealer, supra,* 636 N.E.2d at p. 1134.) What is significant is that the taking of blood and saliva samples for DNA analysis is not the kind of a search that was either

approved or disapproved at the time the Fourth Amendment was enacted, that such a taking differs in fundamental ways from searches undertaken in "most criminal cases," and that whatever privacy interest persons such as appellant retain in their identities is far less than that of persons subject to searches and seizures in the course of ordinary law enforcement. Because of these fundamental differences, it would be improper blindly to adopt the balance struck in connection with most criminal cases. (See *Landry v. Attorney General* (1999) 429 Mass. 336 [709 N.E.2d 1085, 1091-1092, 76 A.L.R.5th 703]; *Rise v. State of Oregon, supra,* 59 F.3d at p. 1559; and *People v. Wealer, supra,* 636 N.E.2d at pp. 1134-1135.) Whether the DNA testing procedures pass muster under the Fourth Amendment should be determined by balancing their intrusion on the individual's privacy interests against their promotion of legitimate governmental interests. ■ And in determining if the balance permits warrantless, suspicionless testing, we consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. (See *People v. Wealer, supra,* 636 N.E.2d at p. 1135, and concurring opinions in *State v. Olivas, supra,* 856 P.2d at pp. 1091-1092 and *Jones v. Murray, supra,* 962 F.2d at p. 313.)

*Application of the Fourth Amendment's Balancing Test*

■ We already have considered both the privacy interests and the governmental interests at stake in the taking of samples for DNA analysis. As discussed above, the privacy interests are minimal—considerably less than those at stake in the ordinary criminal investigation. The governmental interests furthered by the intrusion required by DNA analysis unquestionably are important; arguably even greater than those at stake in "normal law enforcement," because of their potential to solve and prevent large numbers of crimes, and to protect innocent persons from needless investigation.

The scope of the intrusion authorized by Penal Code former section 290.2 is not great. ■ In *Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. 602, the Supreme Court, although recognizing that breath, blood and urine tests certainly are an intrusion, concluded that when the tests are performed on employees, the intrusion is minimized by the fact that the employment context already limits the movements of employees. "Ordinarily, an employee consents to significant restrictions in his freedom of movement where necessary for his employment, and few are free to come and go as they please during working hours. [Citation.] Any additional interference with a railroad employee's freedom of movement that occurs in the time it takes to procure a blood, breath, or urine sample for testing cannot, by itself, be said to infringe significant privacy interests." (*Skinner v.*

*Railway Labor Executives' Assn., supra,* 489 U.S. at pp. 624-625 [109 S.Ct. at p. 1417].) Prisoners, of course, have far less freedom of movement than employees and, accordingly, the interference with that interest resulting from a requirement that they provide blood and saliva samples is further reduced. The court in *Skinner* also considered the nature of blood tests, noting that "the intrusion occasioned by a blood test is not significant, since such 'tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and for most people the procedure involves virtually no risk, trauma or pain.' [Citing *Schmerber v. California, supra,* 384 U.S. at p. 771 [86 S.Ct. at p. 1836].] . . . *Schmerber* thus confirmed 'society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity.' [Citations.]" (*Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. at p. 625 [109 S.Ct. at p. 1417].) ■ Moreover, again, persons such as appellant already are subject to blood tests for purposes of testing for AIDS. Again, the intrusion caused by the testing here is less than overwhelming.

As discussed earlier, the reasons for requiring a warrant do not exist here because there is no discretion on the part of the officials who take the samples, and little or no potential for surprise on the part of those required to provide samples. For similar reasons, the nature of the intrusion on persons such as appellant is reduced. As pointed out by the court in *United States v. Martinez-Fuerte, supra,* 428 U.S. 543, 558 [96 S.Ct. 3074, 3083], approving highway checkpoints for detecting illegal aliens, the intrusion on any particular individual stopped and searched is minimized by the fact that he or she can see that others also are being stopped and searched, and thus the likelihood of fear or annoyance is reduced. (See also *Michigan Dept. of State Police v. Sitz, supra,* 496 U.S. at pp. 452-453 [110 S.Ct. at pp. 2486-2487].)

The final question is the efficacy of DNA testing as a means for meeting the governmental interests at stake. (*Vernonia School Dist. 47J v. Acton, supra,* 515 U.S. at p. 660 [115 S.Ct. at p. 2394].) There is no question but that by providing an effective means of identification, DNA testing is an efficient means of promoting the governmental interests at stake.

In sum, we conclude that the procedures outlined there do not violate the Fourth Amendment.

## II.*

*Admission of Appellant's Statements.*

. . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 1363.

## CONCLUSION

The judgment is affirmed.

Strankman, P. J., and Swager, J., concurred.

A petition for a rehearing was denied September 11, 2000, and appellant's petition for review by the Supreme Court was denied November 29, 2000. Kennard, J., was of the opinion that the petition should be granted.