EDMUND G. BROWN JR. Attorney General MARC J. NOLAN Deputy Attorney General
THE HONORABLE JAN SCULLY, DISTRICT ATTORNEY FOR THE COUNTY OF SACRAMENTO, has requested an opinion on the following questions:
1. For purposes of forensic data collection under the DNA and Forensic Identification Database and Data Bank Act, may a county coroner's office[1] lawfully provide the Department of Justice DNA Laboratory with access to blood specimens or other biological samples that it has obtained, in the ordinary course of its postmortem investigation, from a deceased inmate or parolee who died while under the jurisdiction of *Page 2 
the California Department of Corrections and Rehabilitation after having been convicted of a qualifying criminal offense?
2. If a county coroner's office may lawfully provide the Department of Justice DNA Laboratory with access to forensic identifying material from a qualifying deceased inmate or parolee, is it required to notify the decedent's next of kin before doing so?
3. If a county coroner's office may lawfully provide the Department of Justice DNA Laboratory with access to forensic identifying material from a qualifying deceased inmate or parolee, can it be subject to civil liability for doing so?
 CONCLUSIONS
1. For purposes of forensic data collection under the DNA and Forensic Identification Database and Data Bank Act, a county coroner's office may lawfully provide the Department of Justice DNA Laboratory with access to blood specimens or other biological samples that it has obtained, in the ordinary course of its postmortem investigation, from a deceased inmate or parolee who died while under the jurisdiction of the California Department of Corrections and Rehabilitation after having been convicted of a qualifying criminal offense.
2. In providing the Department of Justice DNA Laboratory with access to forensic identifying material from a qualifying deceased inmate or parolee, a county coroner's office is not required to notify the decedent's next of kin.
3. In providing the Department of Justice DNA Laboratory with access to forensic identifying material from a qualifying deceased inmate or parolee, a county coroner's office is not subject to civil liability.
 ANALYSIS
Under the DNA and Forensic Identification Database and Data Bank Act of 1998, as amended (Act), [2] the Department of Justice (DOJ) maintains a confidential and use-restricted criminal identification DNA database and data bank program (DNA Database)[3] that contains DNA profiles and other forensic identification information from specified *Page 3 
criminal offenders. This group of qualifying offenders includes all state prison inmates and parolees who have been convicted of a felony offense.[4] DNA Database samples are collected primarily through buccal (inner cheek) swabs or blood specimens.
California's DNA Database is part of the Federal Bureau of Investigation's Combined DNA Index System (CODIS) network. The network is designed to enable federal, state, and local crime laboratories to exchange and compare DNA profiles electronically, thereby linking crimes to each other and to convicted offenders.[5] The purpose of the DNA Database is "to assist federal, state, and local criminal justice and law enforcement agencies . . . in the expeditious and accurate detection and prosecution of individuals responsible for sex offenses and other crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons. . . ."[6]
We are informed that a district attorney's office and several other public agencies are engaged in a project that seeks to access any forensic identification samples obtained, postmortem, from certain prison inmates and parolees who died while in the custody of the California Department of Corrections and Rehabilitation (CDCR). The inmates and parolees at issue are those who, as of the time of their deaths, were legally obligated, because of their qualifying criminal convictions, to provide a usable DNA sample, but had not yet done so according to DNA Database records.[7] The goal of this project is to obtain DNA samples from these deceased qualifying offenders in order to help investigate unsolved crimes in which DNA evidence exists but has not been matched to any known offender.[8] California's DNA Database program, which has aided over 13,800 *Page 4 
criminal investigations, [9] as well as the national DNA database program, which has aided over 119,700 investigations, [10] help resolve unsolved crimes through investigative leads obtained by what are known as "cold hits."[11] A basic premise of the deceased offender program is that convicted offenders are likely to have committed additional crimes[12]
We understand that the proponents of the program seek to secure the cooperation of county coroners' offices which, in the course of performing their duties, have obtained blood specimens or other biological samples from deceased inmates and parolees that can be used for limited DNA Database forensic identification purposes. Under the proposal, such specimens and samples would be provided to the DNA Laboratory to be analyzed for forensic identification markers. Some have questioned whether a county coroner's office may lawfully transmit these materials to the DNA Laboratory and, if it may, whether it is required to notify the decedent-criminals' next of kin before providing the samples, and whether providing the samples, with or without notifying the next of kin, may nonetheless expose the coroner's office to some civil liability. Our analysis follows.
 1. Authority to Transmit Specimens and Samples to the DNA Laboratory
According to CDCR statistics and the district attorney's office that requested this opinion, since 1984 over 25,000 inmates and parolees have died while under CDCR jurisdiction, [13] and more than 10,000 of these individuals failed to provide DNA Database samples prior to their deaths, despite being legally obligated to do so. The county coroner has a duty to inquire into and determine the circumstances, manner, and cause of *Page 5 
various types of deaths, including those that occur "in prison or while under sentence."[14] In such cases, the coroner, deputy coroner, or physician acting upon the coroner's direction may examine the body and make identification.[15]
We are told that a coroner's office, in cases where it physically examines the deceased's body, [16] will often take fingerprint impressions, blood specimens, and/or other biological samples in order to confirm the identity of the deceased, [17] as well as for other purposes that further the postmortem investigation. Under such circumstances — that is, where a coroner has obtained specimens or samples that can be used for forensic identification from the body of a convicted criminal who was required to provide DNA samples for use by the DNA Database at the time of death — may the coroner's office lawfully provide the DNA Laboratory with access to such materials for analysis and inclusion in the DNA Database? For the reasons and under the circumstances discussed below, we conclude that it may.
"Like the collection of fingerprints, the collection of DNA samples [under the Act] is an administrative requirement to assist in the accurate identification of criminal offenders."[18] The Act's provisions "are mandatory and automatic upon conviction of a *Page 6 
felony."[19] When it was originally adopted in 1998, one of the Act's primary purposes "`was the desire to close loopholes'" in the collection of forensic identification evidence that existed under former law.[20]
The passage of Proposition 69 in 2004[21] further broadened the scope of DNA sample collection under the Act. In reviewing the amended terms and the ballot arguments presented to the electorate, the Court of Appeal concluded that the "clear intent of the voters was to maximize the available DNA database to aid in the identification, arrest, and conviction of offenders, as well as exonerate the innocent."[22] For example, to address retroactivity issues, Proposition 69 clarified the Act to dictate broadly that the collection of samples "shall occur . . . regardless of when the crime charged or committed became a qualifying offense . . ., and regardless of when the person was convicted of the qualifying offense. . . ."[23] To this end, Proposition 69 also mandated that the Act's "requirements for submission of specimens, samples and print impressions [be accomplished] as soon as administratively practicable [and] shall apply to all qualifying persons regardless of sentence imposed, . . ., or any other disposition *Page 7 
rendered in the case of an adult . . ., or whether the person is diverted, fined or referred for evaluation. . . ."[24]
It is well established that the Constitution permits nonconsensual collection of blood specimens or other biological samples under the Act's provisions (and under similar statutory programs enacted in other jurisdictions) from a living inmate or parolee.[25] While the extraction of these materials is considered a "search" for purposes of the Fourth Amendment, it is unquestionably a reasonable one because (1) the intrusion is minimal, (2) convicted criminals do not enjoy the same expectation of privacy that non-convicts do with respect to their identities and their bodies, and (3) the collection and compilation of forensic identifying information under the Act serves compelling governmental interests, including an "overwhelming public interest" in prosecuting crimes accurately, which also means avoiding and rectifying wrongful convictions.[26]
Of course, "[a]fter death, one is no longer a person within our constitutional and statutory framework, and has no rights of which he may be deprived."[27] Moreover, and in any event, "`persons incarcerated after conviction retain no constitutional privacy interest against their correct identification,'"[28] so they have no privacy interest in this regard that could somehow survive them. At the same time, there continue to be compelling state interests in ascertaining a deceased felon's accurate identification. While the option of prosecuting him or her for a crime he or she might be found to have committed is no longer available, solving such a cold case would nonetheless provide closure to the victim and/or the victim's family members through the assurance that the perpetrator is now known and will not be committing any more crimes.[29]
Another powerful rationale for *Page 8 
gathering these DNA profiles is that the identification of a deceased inmate or parolee as the perpetrator of a crime may prevent otherwise suspected yet innocent individuals from being needlessly investigated or, worse, wrongfully charged or convicted.[30] Also, identifying even a dead perpetrator allows a given cold case to be cleared, thereby avoiding the unnecessary expenditure of investigative or prosecutorial resources, and excluding a deceased inmate or parolee as a possible perpetrator may assist in the efforts to clear such a case. Thus, we are confident that there is no constitutional barrier to the proposal to use coroner-obtained specimens and samples for the purpose of DNA database forensic identification. So then, are there any statutory or other legal impediments to implementing such a procedure? We have found none.
The Act states that all state prisoners and parolees are to "provide buccal swab samples and thumb and palm print impressions and any blood or other specimens required under this chapter" if the prisoner or parolee has been convicted of a qualifying criminal offense (including out-of-state convictions or adjudications for offenses that would constitute qualifying offenses in California), and the person's DNA identification sample is not already in the DNA Database.[31] There is clearly a preference for timely collection; in the case of prison inmates, collection is to be made "immediately at intake, or during the prison reception center process, or as soon as administratively practicable at the appropriate custodial or receiving institution,"[32]
and in the case of parolees, collection is to be taken "within five calendar days of being notified by the court, or a law enforcement agency or other agency authorized by the Department of Justice."[33] But the Act nonetheless requires that a qualifying person's DNA identification sample is to be collected "when it is determined that a qualifying person has not given the required specimens, samples, or print impressions,"[34]
thereby evidencing, in our view, a recognition that this determination will not always be immediate.[35] As has become *Page 9 
apparent, there are many occasions when this determination is only made after a qualifying inmate or parolee has died.[36]
Although the provisions of the Act make no direct reference to deceased qualifying offenders, the Act is comprehensive with respect to the collection of samples from all persons under CDCR jurisdiction who have been convicted of a qualifying offense. For example, we see that the Act directs the DNA Laboratory to "serve as a repository for blood specimens and buccal swab and other biological samples collected," and to "analyze specimens and samples, and store, compile, correlate, compare, maintain, and use DNA and forensic identification profiles and records related to, . . ., [p]ersons required to provide specimens, samples, and print impressions" under the Act.[37] As stated above, this group includes all inmates and parolees under CDCR jurisdiction who have been convicted of a qualifying offense but whose samples are not already in the DNA Database.[38]
By statute, CDCR is charged with notifying the coroner of any death in custody and arranging for the release or disposal of an inmate's remains.[39] Indeed, in the case of deceased inmates, CDCR's own operating procedures dictate that the prison's "senior custody staff member shall arrange for identification of the deceased as soon as practical," in most cases by arranging to have the deceased's fingerprints taken.[40] Further, CDCR retains legal custody of prisoners released to parole supervision, [41] and parole agents are responsible for obtaining verification of the death of a parolee under their supervision.[42] We therefore conclude that an inmate or parolee who dies while still under sentence remains under CDCR jurisdiction at least until the coroner's office fulfills *Page 10 
its statutory duty to inquire into and certify the death, [43] which is when any specimen or sample collection would occur. In turn, such recently-deceased qualifying offenders may be considered in the class of "all" inmates and parolees who are required to provide the identifying genetic materials specified under the Act.[44]
We see no reason why any blood specimens or other biological samples taken by the coroner from the body of a person who has died while under CDCR jurisdiction, and who was legally required to have provided those specimens to the DNA Database as of the time of his or her death, may not be forwarded to the DNA Laboratory.[45] There can be no question that blood specimens and biological samples taken by a coroner in the normal course of a postmortem examination of the body of a qualifying offender have been legally obtained by a qualified medical professional.[46] Nor is there a question that the offender would have been required to provide such material, even without his or her consent and through the reasonable use of force, if necessary, while alive.[47]
Again, dead persons retain no constitutional or statutory rights of which they can be deprived, [48] and in any event, even while alive, a convicted criminal has no cognizable privacy interest in shielding his or her identity from law enforcement authorities.[49] On the other hand, the utility of forensic identification by DNA analysis does not diminish *Page 11 
after death. Under our analysis, a qualifying offender's obligation to provide such materials under the Act may still be satisfied even after his or her death. And, under the circumstances contemplated here, no additional bodily intrusions are even required: the specimens or samples have already been lawfully taken by the coroner for identification or other lawful purposes.
Finally, because the Act clearly allows the authorities to obtain the specified identifying material without the consent of a living person who is required to provide it, we reject any notion that a deceased prisoner's or parolee's inability to consent to the procedure would somehow foreclose the DNA Laboratory from performing an analysis it is otherwise clearly authorized to make.
Our review of the Act's provisions reveals an unmistakable intent to include as many qualifying DNA identification profiles as possible;[50]
and, as we have observed, the Legislature's intent in enacting the Act was to close "loopholes" in data collection that existed under former law.[51] We believe our analysis and conclusions are consistent with both the Act and the legislative intent behind it. In sum, we find no constitutional, statutory, or other legal impediment to a coroner's providing the DNA Database program with access to forensic identifying materials taken from deceased qualifying prisoners.
Therefore, we conclude that for purposes of forensic data collection under the DNA and Forensic Identification Database and Data Bank Act, a county coroner's office may lawfully provide the Department of Justice DNA Laboratory with access to blood specimens or other biological samples it has obtained, in the ordinary course of its postmortem investigation, from a deceased inmate or parolee who died while under the jurisdiction of the California Department of Corrections and Rehabilitation after having been convicted of a qualifying criminal offense.
2. Next of Kin Notification
We next address whether a coroner is obligated to notify a decedent-prisoner's next of kin that biological samples taken from the deceased's body are being provided to the DNA Laboratory for analysis and inclusion in the DNA Database. We find there to be no such obligation. First, of course, there is no question that a coroner has the authority to take blood specimens and/or other biological samples for purposes of the coroner's inquiry into a death, whether for confirming the deceased's identity or *Page 12 
otherwise.[52] Among other things, a coroner is authorized to "make or cause to be made an analysis of the stomach, stomach contents, blood, organs, fluids, or tissues of the body."[53] A coroner is not required to notify or obtain the consent of the deceased's next of kin before taking such actions.[54]
Second, as for providing the DNA Laboratory with access to these specimens and samples, the Act itself constitutes notice that all inmates and parolees convicted of a qualifying offense, without exception, must provide the required specimens and samples for inclusion in the DNA Database.[55] For purposes of the Act, it is immaterial whether the specimens and samples were obtained while the person was alive or as part of a coroner's examination that would have occurred in any event. Thus, we conclude that neither the qualifying offender, nor his or her next of kin, nor anyone else, has a right to be personally notified of the Act's requirements and procedures.
Although the coroner must make reasonable attempts to notify and obtain the consent of the deceased's next of kin before it releases a body or body part "to hospitals, medical educational research institutions, and law enforcement agencies for noncoroner training, educational, and research purposes,"[56] the procedure contemplated here does not involve the release of body parts for training, educational, or research purposes. Rather, providing qualifying samples to the DNA Laboratory serves the more direct, limited, [57] purpose of identifying the deceased offender for law enforcement purposes.[58] *Page 13 
Therefore we conclude that, in providing the Department of Justice DNA Laboratory with access to forensic identifying material from a qualifying deceased inmate or parolee, a county coroner's office is not required to notify the decedent's next of kin.
3. Concerns Regarding Civil Liability
Our answer to the third question follows naturally from our answers to the first two. First, as explained above, a coroner has the authority to take blood specimens and/or other biological samples for purposes of an inquiry into a qualifying offender's death.[59] In addition, to the degree a coroner may be viewed as obtaining samples on behalf of the DNA Database Program, the Act itself provides immunity from civil liability to persons who are authorized to take samples and who do so within professional standards.[60] As for providing the DNA Laboratory with access to these samples, we reiterate that the DNA Laboratory is authorized to receive and analyze such materials so as to create DNA profiles and include them in the DNA Database, and that the coroner's office is authorized to forward them to the DNA Laboratory for those purposes. And, as also explained above, a coroner's office has no duty to notify or obtain consent from a qualifying offender's next of kin before providing his or her forensic identification samples to the DNA Laboratory.
For these reasons, a would-be plaintiff could not establish a civil cause of action. While some have expressed a concern that a qualifying offender's next of kin may claim either a property interest in the deceased's biological materials, or that the act of forwarding those materials may constitute the negligent (or intentional) infliction of emotional distress upon the next of kin, we believe those concerns to be unfounded. California law is clear that next of kin have no property interest in the contents of a deceased's body, [61] but only a temporary quasi-property right in the custody of the body *Page 14 
for purposes of its burial or other disposition.[62] This limited right is not infringed upon when a coroner performs a lawful examination.[63]
And, while a defendant may conceivably be liable in tort for the negligent (or intentional) infliction of emotional distress on a deceased's next of kin in circumstances where the defendant owes such persons a duty of care, [64] we have concluded that a coroner has no duty to refrain from providing the DNA Laboratory with a qualified prisoner's or parolee's identifying material, nor to notify next of kin before doing so.
Accordingly, in response to the third question, we conclude that, in providing the Department of Justice DNA Laboratory with access to forensic identifying material from a qualifying deceased inmate or parolee, a county coroner's office is not subject to civil liability.[65]
[1] A coroner is a county officer, either elected or appointed, whose office is responsible for inquiring into the cause and manner of specified deaths that occur within the county. See Govt. Code §§ 24000(m),24009(b), 27491. In lieu of a coroner, a county board of supervisors may instead appoint a "medical examiner," who must be a licensed physician qualified as a specialist in pathology. Govt. Code § 24010. Because a medical examiner exercises the same powers and performs the same duties as a coroner, see id., the reasoning and conclusions of this opinion apply to both designations.
[2] Pen. Code §§ 295-300.3.
[3] Pen. Code § 295(g), (h).
[4] Pen. Code §§ 296(a), 296.1(a)(2). In addition, certain misdemeanor convictions that result in the convicted person having to register as a sex offender under Penal Code section 290 or as an arson offender under Penal Code section 457.1 are also considered qualifying offenses under the Act. See Pen. Code § 296(a)(3).
[5] See http://fbi.gov/hq/lab/html/codisbrochure_text.htm. CODIS operates much the same way as fingerprint identification programs — that is, by utilizing computer comparisons that identify "forensic unknowns" (or crime scene samples) with reference to a felony offender's known sample that was previously obtained, analyzed, and stored in accordance with state or federal law. U.S. v. Kincade, 379 F.3d 813, 818-820 (9th Cir. 2004); Pen. Code § 295(c), (g), (h)(4).
[6] Pen. Code § 295(c).
[7] See Pen. Code § 296.1(a)(2)(A) (a)(3)(A).
[8] The DOJ Bureau of Forensic Services reports that, as of July 31, 2010, there were 33,125 "forensic unknown evidence profiles" in the DNA Database that had been fully analyzed and uploaded into CODIS. See
http://ag.ca.gov/bfs/pdf/Monthly.pdf.
[9] See http://ag.ca.gov/bfs/pdf/quarterlyrpt.pdf (figures current as of June 30, 2010).
[10] See http://fbi.gov/hq/lab/codis/clickmap.htm (figures current as of July 31, 2010).
[11] A cold hit is a "match of a crime scene sample with a suspect identified through a database search." U.S. v. Jenkins, 887 A.2d 1013, 1017
(D.C. 2005); see People v. Johnson, 139 Cal. App. 4th 1135, 1146 n. 13 (2006).
[12] See People v. King, 82 Cal. App. 4th 1363, 1376 (2000) ("It also is an unfortunate truth that many offenders commit more than one crime, and recidivism is common."); cf. Samson v. Cal., 547 U.S. 843,853-854 (2006) (California's parolee population has a 68-70 percent recidivism rate).
[13] Although released from the physical confines of the state prison, parolees remain under CDCR's legal custody and "shall be subject at any time to be taken back within the inclosure [sic] of the prison." Pen. Code § 3056.
[14] Govt. Code § 27491.
[15] Govt. Code § 27491.2(a).
[16] The coroner's office does not necessarily perform a physical examination in the case of all inmate and parolee deaths. Under Government Code section 27491, the coroner has "discretion to determine the extent of inquiry to be made into any death occurring under natural circumstances." For example, where a decedent dies from natural causes, or from a medically-confirmed disease, the coroner may determine that no physical examination is required and that it will suffice to accept the conclusions of the deceased's treating physician as to the cause of death. In other words, the coroner's office may not take blood specimens and/or other biological samples in every case. In any event, this opinion is only concerned with those specimens and samples that the coroner has in fact taken within the course of performing official duties.
[17] The Act explicitly recognizes the coroner's functions and states that its provisions shall not be construed so as "to limit the authority of local or county coroners or their agents, in the course of their scientific investigation, to utilize genetic and DNA technology to inquire into and determine the circumstances, manner, and cause of death, or to employ or use outside laboratories, hospitals, or research institutions that utilize genetic and DNA technology." Pen. Code §300.1(b).
[18] Pen. Code § 295(d).
[19] People v. Travis, 139 Cal. App. 4th 1271, 1279 (2006).
[20] Good v. Super. Ct., 158 Cal. App. 4th 1494, 1500 (2008) (quoting People v. Brewer, 87 Cal. App. 4th 1298, 1301 (2001)). California has collected blood and saliva specimens for identification purposes from convicted sex and violent offenders since 1984. See former § 290.2 (added by 1983 Stat. ch. 700, repealed and replaced by Pen. Code §§ 295 et seq.). In 1998, the Legislature passed the Act, significantly expanding the list of felony offenses that trigger data bank collection. The Act also authorized a comprehensive state data bank program, to be administered by the DNA Laboratory and coordinated with the nationwide CODIS system. See 1998 Stat. ch. 696 § 2 (Assembly 1332); former Pen. Code §§ 295(d), 296(a)(1) (West 2000); see generally Alfaro v. Terhune,98 Cal. App. 4th at 497-498 (discussing evolution of DNA databases in California).
[21] In the November 2004 general election, the voters passed Proposition 69, the DNA Fingerprint, Unsolved Crime and Innocence Protection Act, which again expanded data base sample collection under the Act. Proposition 69 expressly recognized that "[l]aw enforcement should be able to use the DNA Database and Data Bank Program tosubstantially reduce the number of unsolved crimes; . . .; to exonerate
persons wrongly suspected or accused of crime; and to identify human remains." Ballot Pamp., Gen. Elec. (Nov. 2, 2004), text of Prop. 69 § II (Findings and Declarations of Purpose) at 135 (emphasis added); see
http://vote2004.sos.ca.gov/voterguide/propositions/prop69text.pdf.
[22] Good, 158 Cal. App. 4th at 1509.
[23] Pen. Code § 296.1(b); see Good, 158 Cal. App. 4th at 1503-1504.
[24] Pen. Code § 296(b) (emphasis added).
[25] People v. Robinson, 47 Cal. 4th 1104, 1119-1121 (2010).
[26] Id.; see In re Calvin S., 150 Cal. App. 4th 443, 447 (2007);People v. Travis, 139 Cal. App. 4th at 1281-1290, People v. Johnson,139 Cal. App. 4th at 1168; People v. Adams, 115 Cal. App. 4th 243,258 (2004); Alfaro v. Terhune, 98 Cal. App. 4th 492, 505 (2002);People v. King, 82 Cal. App. 4th at 1374-1375; U.S. v. Kincade,379 F.3d at 837; Rise v. Or., 59 F.3d 1556, 1560 (9th Cir. 1995).
[27] Whitehurst v. Wright, 592 F.2d 834, 840 (5th Cir. 1979); see alsoLove v. Bolinger, 927 F. Supp. 1131, 1136 (S.D. Ind. 1996).
[28] Robinson, 47 Cal.4th at 1121 (quoting Groceman v. U.S. Dept. ofJustice, 354 F.3d 411, 413-414 (5th Cir. 2004)).
[29] See U.S. v. Kincade, 379 F.3d at 838 (DNA profiling "helps bring closure to countless victims of crime who long have languished in the knowledge that perpetrators remain at large.")
[30] See People v. King, 82 Cal. App. 4th at 1375-1376; Pen. Code § 295(c).
[31] Pen. Code § 296.1(a)(2)(A) (a)(3)(A).
[32] Pen. Code § 296.1(a)(2)(A).
[33] Pen. Code § 296.1(a)(3)(B).
[34] Pen. Code § 295(h)(1).
[35] For example, the DNA Laboratory may notify CDCR or another law enforcement agency having jurisdiction over a qualifying person that the person's sample is not usable and request an additional one, which the qualifying person is then obligated to provide. Pen. Code § 296.2(a). The DNA Laboratory is also authorized to analyze existing samples that a qualifying person has given to law enforcement for any purpose. Pen. Code § 296.2(b).
[36] Before 1998, the Act's predecessor statute (former Penal Code section 290.2) did not as clearly spell out that DNA sample collection was to occur at intake, a circumstance that some believe has contributed to the number of inmates who died in custody without providing the required DNA identification samples.
[37] Pen. Code § 295.1(c)(4).
[38] Pen. Code § 296.1(a)(2)(A) (a)(3)(A).
[39] Pen. Code §§ 5021, 5022, 5061; see also 15 Cal. Code Regs. § 3357(e), (f), (g); see generally CDCR Operating Man. ch. 5 (Custody and Security Operations) art. 7 (Inmate Deaths, Serious Injury or Illness Notification) §§ 51070.1-51050.20.
[40] CDCR Operating Man. ch. 5 art. 7 § 51070.7.1. In cases of suspected homicide, fingerprinting is to be performed by the coroner or the coroner's designee. Id.
[41] Pen. Code § 3056.
[42] CDCR Operating Man. ch. 5 art. 7 § 51070.18.1.
[43] Govt. Code § 27491.
[44] Pen. Code § 296.1(a)(2)(A) (a)(3)(A).
[45] Pen. Code § 295.1(c)(4).
[46] See Govt. Code § 27491.4(a) (coroner may "make or cause to be made an analysis of the stomach, stomach contents, blood, organs, fluids, or tissues of the body" for postmortem inquiry). As for the collection of blood specimens, the Act further specifies that the "withdrawal of blood shall be performed in a medically approved manner" and only by "health care providers trained and certified to draw blood." Pen. Code § 298(b)(2). Of course, the persons performing postmortem physical examinations under the direction of the coroner's office are medical doctors. See Govt. Code § 27499 (coroner may "summon a surgeon or physician to inspect the body or hold a postmortem examination"); Benson v. Super. Ct.,185 Cal. App. 4th 1179, 1188 (2010) (coroner who is not a medical doctor must employ licensed physician to conduct postmortem exams); seealso Govt. Code § 24010 (medical examiner appointed in lieu of coroner "shall be a licensed physician and surgeon duly qualified as a specialist in pathology").
[47] Pen. Code § 298.1.
[48] Whitehurst v. Wright, 592 F.2d at 840.
[49] Robinson, 47 Cal. 4th at 1121.
[50] Pen. Code, § 296.1(a)(2)(A) (a)(3)(A).
[51] Good, 158 Cal. App. 4th at 1500; Brewer,87 Cal. App. 4th at 1301.
[52] Govt. Code §§ 27491.2(a), 27491.4(a).
[53] Govt. Code § 27491.4(a).
[54] Id.; see also Benson, 185 Cal. App. 4th at 1189-1190.
[55] Pen. Code § 296(b). Under the constructive notice provided by published statutes and judicial interpretations of them, all persons are presumed to know the governing law. See Arthur Andersen v. Super. Ct.,67 Cal. App. 4th 1481, 1506-1507 (1998); 1119 Delaware v. ContinentalLand Title Co., 16 Cal. App. 4th 992, 1002 (1993).
[56] See Govt. Code § 27491.45(a)(2).
[57] The Act specifies that the DNA profiles and other identifying information it authorizes may not be used for any other purposes, Pen. Code §§ 295.1(a) (b), 297(a), that this material is to be kept confidential and is exempt from public disclosure laws, Pen. Code §299.5(a), (b) (h), and that any person making improper use of such material will be subject to criminal prosecution, Pen. Code § 299.5(i).
[58] While the next of kin have a legal right to exercise some control over whether and how the deceased's body parts are used in research or in the training or education of other individuals — corresponding in essence to the deceased person's right to make such decisions and directions while alive — a deceased felon's next of kin have no right to block the accurate ascertainment of that person's identity.
[59] Govt. Code §§ 27491.2(a), 27491.4(a).
[60] See Pen. Code § 298(c)(1) ("Persons authorized to draw blood or obtain samples or print impressions under this chapter for the data bank or database shall not be civilly or criminally liable either for withdrawing blood when done in accordance with medically accepted procedures, or for obtaining buccal swab samples by scraping inner cheek cells of the mouth, or thumb or palm print impressions when performed in accordance with standard professional practices.")
[61] Enos v. Snyder, 131 Cal. 68, 69 (1900); Estate of Jimenez,56 Cal. App. 4th 733, 740 (1997); Holm v. Super. Ct.,187 Cal. App. 3d 1241, 1245 (1986); Gray v. S. P. Co.,21 Cal. App. 2d 240, 246 (1937).
[62] See Health Safety Code §§ 7100, 7102; Spates v. DameronHosp. Assn., 114 Cal. App. 4th 208, 221-222 (2003).
[63] Benson, 185 Cal. App. 4th at 1190-1191; Gray,21 Cal. App. 2d at 246.
[64] See Aguirre-Alvarez v. Regents of the U. of Cal.,67 Cal. App. 4th 1058, 1063 (1998).
[65] We have also been told that issues exist involving the costs that might be associated with the type of program contemplated here, how those costs may be allocated, and whether and how the agencies involved might receive additional funding, but those issues go well beyond the scope of this opinion. We do not conclude here that any particular coroner's office is required to participate in a specimen/sample sharing program of this sort; much less do we reach any conclusion as to how any associated costs might be allocated, shared, or funded. We simply conclude that the sharing of deceased inmate and parolee specimens and samples with the DNA Laboratory, under the circumstances we have described, is legally permissible, that next-of-kin notification is not required, and that the coroner is not subject to civil liability for exercising this permissible option. *Page 1